UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| SIEMENS HEALTHCARE DIAGNOSTICS, A SUBSIDIARY OF SIEMENS MEDICAL SOLUTIONS USA, INC. | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 19-cv-00090 |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) ) | |

## COMPLAINT

Plaintiff Siemens Healthcare Diagnostics, a subsidiary of Siemens Medical Solutions USA, Inc. ("Siemens" or "Plaintiff"), by and  through its attorneys, alleges and states the following cause of action:

## I.  JURISDICTION AND STANDING

1. Siemens brings this action to contest thirteen (13) protests denied by U.S. Customs & Border Protection (CBP) under Section 515 of the Tariff Act of 1930, as amended (19 U.S.C. § 1515) and the unlawful liquidation of entries of merchandise by the U.S. Customs and Border Protection ("Customs" or "CBP"), an agency of the United States.

2. This Court has exclusive jurisdiction of this civil action pursuant to 28 U.S.C. § 1581(a).

3. Siemens has paid all liquidated duties and fees required on the entries involved in this action.

4. Plaintiff is the importer of record and actual owner of all merchandise covered by the entries involved in this action.

1

5. Siemens has standing pursuant to 28 U.S.C. § 2631(a), because it timely filed the subject protests pursuant to Section 514 of the Tariff Act of 1930 (19 U.S.C. § 1514), which were subsequently denied by CBP.

6. Plaintiff's protests of the liquidation of the entries and classification of the merchandise that are the subject of this action were filed within 180 days of CBP's liquidation of the subject entries, and therefore were timely filed pursuant to 19 U.S.C. § 1514(c)(3).

7. Plaintiff filed this action within 180 days after receipt of CBP's denial of the protests as required by 28 U.S.C. § 2636(a)(1).

## II.  **FACTUAL ALLEGATIONS**

### A. Background on Products

8. The imported goods that are the subject of this action are various 3gAllergy™ Allergen Panels (hereinafter "subject goods").  The subject goods consist of a protein extract derived from natural sources, which is contained in a liquid carrier medium.

9. The protein extract is derived from natural sources bonded to the d-biotin Hexahydro-2-oxothieno(3,4-d)-imidazole-4-pentanoic acid (CAS No. 58-85-5) ("Vitamin B7").  A complete list of the subject goods is included as **Exhibit A.**

10. One such product is identified commercially as "IMMULITE 2000 Olive 40T" (hereinafter "Olive 40T"), which is a  ligand-labeled (d-biotin) allergen, consisting of a protein extract derived from olive tree pollen bonded to Vitamin B7.

11. The subject goods are primarily immunological reagents (allergen) used with a separately imported *in vitro* diagnostic "test kit" (i.e., the IMMULITE 2000 3gAllergy Specific IgE" diagnostic test kit) used in the diagnosis of allergic disorders.  *See* **Exhibit B**.

12. The diagnostic test kit has both a solid phase and a liquid phase.  The solid phase of the test kit

is a plastic bead coated with a biologically derived protein called streptavidin, (CAS No. 9013-20-1).

13. The diagnostic test kit, used in conjunction with the subject goods as part of a testing procedure, can help a physician identify whether an individual is sensitive to a particular allergen.  The Olive 40T product referred to in ¶ 10 is used specifically to identify whether an individual is sensitive to olive tree pollen.

14. The subject goods will undergo either one or three chemical reactions as part of the aforementioned "testing" procedure, depending on whether a particular antibody exists in the human blood sample.

15. The test procedure is itself a two-step procedure for detecting whether a human blood sample contains antibodies for specific allergens, with a chemiluminescent immunoassay procedure. Plaintiff provides the test procedure instructions as **Exhibit B.**

16. During the first step of the test procedure, the streptavidin coated bead, the subject goods, and a human blood sample are mixed together and incubated for 30 minutes.

17. During this phase, two separate chemical reactions occur.  The first chemical reaction always occurs, which is when the subject goods react with and chemically bind to the streptavidin protein on the plastic bead.

18. The second chemical reaction occurs only if the human blood sample contains the IgE antibody specific for the olive tree pollen (the subject goods). During this step, if specific IgE to olive tree pollen was present in the human blood sample and has bound to the subject goods, the alkaline phosphatase binds to the IgE attached to the subject goods.

19. Once these reactions are complete, excess liquids are removed by centrifugation and a (chemiluminescent) substrate is added to the reaction tube containing the plastic beads. The (chemiluminescent) light signal generated in the reaction tube is proportional to the bound

alkaline phosphatase that was conjugated to the murine monoclonal anti-human IgE antibody.

20. The final reaction product is placed into an "Immulite 2000" analyzer, which will then indicate whether the subject goods have undergone all three of the reactions described in ¶¶ 17 and 18 by detecting the amount of alkaline phosphatase present, thus determining whether the antibody was present in the human blood sample used for the test.

21. The chemiluminescent light signal is photometrically measured by the analyzer and compared against known standards to determine whether there is any IgE in the patient sample.

**B. Plaintiff's Importation and CBP's Misclassification**

22. Between November 18, 2016 and August 20, 2018, Siemens entered multiple shipments of the subject goods at the Ports of Indianapolis, IN; Memphis, TN; and Chicago, IL. *See* **Exhibit C** for a complete list of entries, entry dates, and liquidation dates.

23. As shown in **Exhibit C**, Siemens entered a total of three thousand seven hundred and ninety-six (3,796) entry  line numbers of the subject goods across seventy-four (74) entries, all of which are subject to this action.

24. Between November 25, 2016 and February 1, 2019, CBP liquidated all subject entries under subheading, 3824.99.92, of the Harmonized Tariff Schedule of the United States ("HTSUS"), a basket category which provides as follows:  "Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included: Other: Other: Other: Other: Other: Other."  This subheading carries a duty rate of 5% ad valorem.  Plaintiff paid all customs duties as instructed by CBP.

25. Between January 13, 2017, and February 1, 2018, Siemens timely filed thirteen (13) administrative protests with the Port of Indianapolis, IN, contesting that CBP's liquidation of the subject goods under HTSUS subheading 3824.99.92 was unlawful.  *See* **Exhibit D**.

Plaintiff requested Additional Further Review ("AFR") for all of the protests identified in the Exhibit, except for Protest No. 4110-19-100065.

26. In its protest, Siemens argued principally that the subject goods should be classified as a "reagent" under 3822.00.5090, HTSUS because it is used in such a way via a chemical "reaction", thereby "creating a different material" which is then "bound to an anti-biotin bead." *See* **Exhibit D** at 3. Siemens pointed out that the fact that the subject good "directly reacts" with various compounds to produce a new and "different material" means that it is an "in vitro diagnostic test ***reagent*** and appropriately classified" as such (under GRI 1) under 3822.00.5090, HTSUS, as a "reagent." *See id.*

27. Siemens argued that such a classification was consistent with Headquarters Ruling Letter ("HQ") H129336, which defines a reagent as "a substance employed as a test to determine the presence of some other substance by means of the reaction which is produced" and that "typically, a reagent is mixed with another chemical, reacts with it, and its consumed in that reaction, creating a different set of chemicals. *See* **Exhibit D** at 3, citing HQ H129336. Siemens argued in its protest that this is precisely what happens with the subject goods.

28. Plaintiff contended, therefore, that the subject goods were properly classified under HTSUS subheading 3822.00.5090 as a reagent, which provides as follows: "Diagnostic or laboratory ***reagents*** on a backing and prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006; certified reference materials: Diagnostic or laboratory reagents on a backing, prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006: Other." *See* HTSUS 3822.00.50.90. (emphasis added). This subheading is duty-free.

29. Plaintiff's initial AFR was granted on February 17, 2017. The denied protest was reviewed by CBP, which later published ruling HQ H286756 (November 13, 2018), instructing the Port

of Cleveland to deny Protest No. 4110-17-100015.  *See* **Exhibit E**.  On January 16, 2019, CBP denied the twelve protests filed between January 13, 2017, and December 4, 2017, listed in ¶ 25, supra, in full.  On May 29, 2019, CBP denied the Protest No. 411019100065, supra, in full. CBP based its denials on CBP ruling HQ H286756.  *See* **Exhibit E**.

30.  CBP ruling HQ H286756 relied upon CBP Laboratory Report No. NY20160561, issued by CBP's Laboratory and Scientific Services Division on August 29, 2016.  This report was issued in relation to testing done by CBP on a sample of the "IMMULITE Olive 40T" product.  *See* **Exhibit F**.

31.  CBP Laboratory Report No. NY20160561 states, in pertinent part: "The product is a mixture of antigens, derived from olive trees, *chemically bound to molecules of biotin*. During performance of the test, the antigen portion binds to specific antibodies contained in the patient's blood."  *See* **Exhibit F**.  (emphasis added).

32.  By stating in the laboratory report that the product has antigens "chemically bound" to other molecules, CBP acknowledged that the product engages in a "chemical" reaction.

33.  Indeed, this is the very essence of the definition of a chemical reaction, which is a reaction that "rearranges the constituent atoms of the reactants to create different substances as products."  *See* https://www.britannica.com/science/chemical-reaction (last checked July 31, 2019).

34.  Similarly, the Compact Oxford English Dictionary, Second Edition (p. 271, 1991), defines the term "reagent" as "a substance employed as a test to determine the presence of some other substance by means of the reaction which is produced. *Now, any substance employed in chemical reactions*."  *See* **Exhibit E** (emphasis added); *See also* HQ H129336, at 4 (included as **Exhibit G**).

35.  Hawley's Condensed Chemical Dictionary defines a reagent, in part, as "any substance used in a reaction for the purpose of detecting, measuring, examining, or analyzing other

substances."  *See* **Exhibit E**; *See also* HQ H259355, at 9 (included as **Exhibit H**).

## III.  COUNT ONE

36.  Siemens reaffirms and re-alleges each allegation contained in ¶¶ 1 through 35 above as if fully set forth herein.

37.  Plaintiff's imported 3gAllergy™ Allergen Panels are clearly "reagents" within the meaning of that term as used in the HTSUS.   The subject goods clearly undergo the requisite "chemical reaction", and they otherwise meet the definition of that term.

38.  As such, the subject goods are specifically described at the four-digit level by heading 3822, HTSUS ("prepared diagnostic or laboratory **reagents,** whether or not on a backing") (emphasis added).

39.  Therefore, under the General Rules of Interpretation ("GRI"), CBP should have classified Plaintiff's entries of the subject goods as "prepared diagnostic or laboratory reagents" under heading 3822, HTSUS. CBP's classification and liquidation of Plaintiff's subject goods under heading 3824, HTSUS ("preparations of the chemical or allied industries … not elsewhere specified or included) was contrary to law.

40.  CBP's decision to classify the goods under a different heading (i.e. 3824) was directly contrary to the meaning of the term "reagent" as used in HTSUS 3822, and it was directly contrary to several of CBP's prior rulings regarding the proper classification of "reagents", including HQ H129336 and HQ H259355.   CBP's actions in doing so were arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

41.  At the subheading level, the subject goods are properly classified under subheading 3822.00.5090, HTSUS, which provides for "[P]repared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006 … : [p]repared

diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006: Other: Other," pursuant to GRI 1.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment against Defendant and award the following relief:

a.  Hold unlawful CBP's liquidation of Plaintiff's entries of subject goods under HTSUS 3824;

b.  Hold unlawful CBP's denial of Plaintiff's protests;

c.  Determine as a matter of law that the subject goods which consist of ligand-labeled (d-biotin) allergens (a protein extract derived from natural sources bonded to the d-biotin Hexahydro-2-oxothieno(3,4-d)-imidazole-4-pentanoic acid (CAS No. 58-85-5)) contained in a liquid carrier medium are "reagents" and properly classified under HTSUS subheading 3822.00.5090;

d.  Order CBP to reliquidate the subject entries accordingly and to refund to Plaintiff all excess duties assessed, plus interest as provided by law;

e.  Award Plaintiff costs and attorney's fees and expenses as permitted by law; and

f.  Grant Plaintiff such further and additional relief as this Court may deem just and proper.

Respectfully submitted,

Robert LaFrankie
Daniel Cannistra
Aaron Marx

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500
amarx@crowell.com

*Counsel for Siemens Healthcare Diagnostics, a subsidiary of Siemens Medical Solutions USA, Inc.*

Dated:  September 16, 2019

# LIST OF EXHIBITS

Exhibit A        List of all "3gAllergy™ Allergen Panels" at issue

Exhibit B        Instructions and Test Procedure for the IMMULITE Olive 2000 3gAllergy Specific IgE diagnostic test kit, entitled "3gAllergy™ Specific IgE Universal Kit"

Exhibit C        Complete list of entries, entry dates, and liquidation dates

Exhibit D        Memorandum in Support of Protest No. 4110-17-100015

Exhibit E        CBP Headquarters Ruling Letter H286756

Exhibit F        CBP Laboratory Report NY20160561

Exhibit G        CBP Headquarters Ruling Letter H129336

Exhibit H        CBP Headquarters Ruling Letter H259355

# Exhibit A

| ProductNum | Allergen Panel Description |
|---|---|
| 10360570 | IML. 2000 NCAN F 1 20T |
| 10360571 | IML. 2000 nDer f 1 20T |
| 10360572 | IML. 2000 nDer f 2 20T |
| 10360573 | IML. 2000 nAsp r 1 20T |
| 10360574 | IML. 2000 nDer p 1 20T |
| 10360575 | IML. 2000 nDer p 2 20T |
| 10360576 | IML. 2000 nFel d 1 20T |
| 10360577 | IML. 2000 STEMPHYLIUM SOLANI 20T |
| 10368597 | IML. 2000 nBet v 1 20T |
| 10370455 | IML. CAT SERUM ALBUMIN 20T |
| 10370456 | IML. DOG SERUM ALBUMIN 20T |
| 10370467 | IML. 2000 nOle e 1 20T |
| 10370468 | IML. 2000 nArt v 1 20T |
| 10385630 | IML. 2000 DERMA. PTERONYSSINU 40T |
| 10385631 | IML. 2000 BLOMIA TROPICALIS 20T |
| 10385633 | IML. 2000 DERMA. FARIAE 40T |
| 10385634 | IML. 2000 DERM. MICROCERAS 20T |
| 10385635 | IML. 2000 ACARUS SIRO 20T |
| 10385636 | IML. 2000 LEPIDOGLYPHUS DESTR 20T |
| 10385637 | IML. 2000 TYROPHAGUS PUTRECEN 20T |
| 10385638 | IML. 2000 GLYEYPHAGUS DOMESTIC 20T |
| 10385639 | IML. 2000 EUROGLYPHUS MAYNEI 20T |
| 10385642 | IML. 2000 CAT DANDER EPITHELIUM 40T |
| 10385643 | IML. 2000 CANARY FEATHERS 20T |
| 10385648 | IML. 2000 DOG EPITHELIUM 40T |
| 10385650 | IML. 2000 HORSE DANDER 40T |
| 10385651 | IML. 2000 COW DANDER 20T |
| 10385653 | IML. 2000 DOG DANDER 40T |
| 10385654 | IML. 2000 GUINEA PIG EPITHELIUM 20T |
| 10385655 | IML. 2000 GOOSE FEATHERS 20T |
| 10385656 | IML. 2000 MOUSE EPITHELIUM 20T |
| 10385657 | IML. 2000 MOUSE URINE 20T |
| 10385658 | IML. 2000 RAT EPITHELIUM 20T |
| 10385659 | IML. 2000 RAT URINE 20T |
| 10385660 | IML. 2000 RAT SERUM PROTEINS 20T |
| 10385661 | IML. 2000 MOUSE SERUM PROTEIN 20T |
| 10385662 | IML. 2000 BUDGERIGAR FEATHER 20T |
| 10385663 | IML. 2000 PIGEON DROPPINGS 20T |
| 10385664 | IML. 2000 GOAT EPITHELIUM 20T |
| 10385665 | IML. 2000 SHEEP EPITHELIUM 20T |
| 10385667 | IML. 2000 RABBIT EPITHELIUM 40T |
| 10385668 | IML. 2000 SWINE EPITHELIUM 20T |
| 10385669 | IML. 2000 HAMSTER EPITHELIUM 20T |
| 10385670 | IML. 2000 CHICKEN FEATHERS 20T |
| 10385671 | IML. 2000 DUCK FEATHERS 20T |
| 10385672 | IML. 2000 RAT 20T |
| 10385673 | IML. 2000 MOUSE 20T |

| | |
|---|---|
| 10385674 | IML. 2000 TURKEY FEATHERS 20T |
| 10385675 | IML. 2000 PARROT FEATHER 20T |
| 10385677 | IML. 2000 ANIMAL PANEL #1 (40T) |
| 10385685 | IML. 2000 CANTALOUPE 20T |
| 10385686 | IML. 2000 CHOCOLATE 20T |
| 10385687 | IML. 2000 SESAME SEED 20T |
| 10385689 | IML. 2000 BUCKWHEAT 20T |
| 10385690 | IML. 2000 GREEN PEA 20T |
| 10385692 | IML. 2000 PEANUT 40T |
| 10385693 | IML. 2000 FLOUNDER 20T |
| 10385695 | IML. 2000 SOYBEAN 40T |
| 10385696 | IML. 2000 WHITE BEAN 20T |
| 10385699 | IML. 2000 HAZELNUT 40T |
| 10385700 | IML. 2000 LIMA BEAN 20T |
| 10385701 | IML. 2000 BRAZIL NUT 20T |
| 10385704 | IML. 2000 EGG WHITE 40T |
| 10385705 | IML. 2000 PECAN NUT 20T |
| 10385706 | IML. 2000 CASHEW 20T |
| 10385707 | IML. 2000 PISTACHIO 20T |
| 10385708 | IML. 2000 TROUT 20T |
| 10385711 | IML. 2000 CLAM 20T |
| 10385712 | IML. 2000 LEMON 20T |
| 10385713 | IML. 2000 GRAPEFRUIT 20T |
| 10385714 | IML. 2000 ALMOND 20T |
| 10385715 | IML. 2000 EGG PINEAPPLE 20T |
| 10385716 | IML. 2000 MUSHROOM 20T |
| 10385718 | IML. 2000 SPINACH 20T |
| 10385719 | IML. 2000 LETTUCE 20T |
| 10385720 | IML. 2000 CABBAGE 20T |
| 10385724 | IML. 2000 SUGAR CANE 20T |
| 10385725 | IML. 2000 CINNAMON 20T |
| 10385726 | IML. 2000 COFFEE 20T |
| 10385730 | IML. 2000 PUMPKIN 20T |
| 10385735 | IML. 2000 VANILLA 20T |
| 10385737 | IML. 2000 WHEY 20T |
| 10385738 | IML. 2000 APRICOT 20T |
| 10385739 | IML. 2000 CRAB 20T |
| 10385740 | IML. 2000 CHERRY 20T |
| 10385741 | IML. 2000 CUCUMBER 20T |
| 10385742 | IML. 2000 EGG 20T |
| 10385745 | IML. 2000 SHRIMP 40T |
| 10385746 | IML. 2000 PINE NUT 20T |
| 10385748 | IML. 2000 PLUM 20T |
| 10385749 | IML. 2000 WALNUT 20T |
| 10385751 | IML. 2000 GRAPE 20T |
| 10385753 | IML. 2000 TOMATO 40T |
| 10385754 | IML. 2000 BROCCOLI 20T |

| | |
|---|---|
| 10385755 | IML. 2000 ASPARAGUS  20T |
| 10385757 | IML. 2000 GREEN PEPPER  20T |
| 10385760 | IML. 2000 BASIL   20T |
| 10385761 | IML. 2000 PORK 20T |
| 10385762 | IML. 2000 GINGER 20T |
| 10385769 | IML. 2000 CHILI-PEPPER 20T |
| 10385770 | IML. 2000 BEEF 20T |
| 10385771 | IML. 2000 BLACK PEPPER 20T |
| 10385773 | IML. 2000 OREGANO 20T |
| 10385774 | IML. 2000 TURKEY MEAT  20T |
| 10385775 | IML. 2000 RED KIDNEY BEAN  20T |
| 10385776 | IML. 2000 BLUEBERRY  20T |
| 10385778 | IML. 2000 OYSTER  20T |
| 10385779 | IML. 2000 CAULIFLOWER  20T |
| 10385782 | IML. 2000 CHESTNUT 20T |
| 10385784 | IML. 2000 MILK 40T |
| 10385785 | IML. 2000 PINTO BEAN 20T |
| 10385788 | IML. 2000 HALIBUT 20T |
| 10385789 | IML. 2000 LIME 20T |
| 10385794 | IML. 2000 GREEN BEAN 20T |
| 10385797 | IML. 2000 CARROT 40T |
| 10385799 | IML. 2000 WATERMELON 20T |
| 10385800 | IML. 2000 SOLE 20T |
| 10385801 | IML. 2000 SCALLOP 20T |
| 10385803 | IML. 2000 ORANGE 40T |
| 10385807 | IML. NPEN M 1 (TROPOMYOSIN) 20T |
| 10385809 | IML. 2000 POTATO 20T |
| 10385810 | IML. 2000 YOGURT 20T |
| 10385811 | IML. 2000 COCONUT 20T |
| 10385812 | IML. 2000 BLUE MUSSEL 20T |
| 10385813 | IML. 2000 RED SNAPPER 20T |
| 10385815 | IML. 2000 CODFISH 40T |
| 10385818 | IML. 2000 BREWERS YEAST 20T |
| 10385824 | IML. 2000 TUNA 20T |
| 10385825 | IML. 2000 SALMON 20T |
| 10385826 | IML. 2000 HADDOCK 20T |
| 10385827 | IML. 2000 STRAWBERRY 20T |
| 10385828 | IML. 2000 BAKERS YEAST 20T |
| 10385829 | IML. 2000 GARLIC 20T |
| 10385830 | IML. 2000 ONION 20T |
| 10385832 | IML. 2000 APPLE 40T |
| 10385834 | IML. 2000 WHEAT 40T |
| 10385835 | IML. 2000 CHUB MAKEREL 20T |
| 10385836 | IML. 2000 SWEET POTATO 20T |
| 10385841 | IML. 2000 RYE 20T |
| 10385843 | IML. 2000 PERCH 20T |
| 10385845 | IML. 2000 BARLEY 20T |

| 10385847 | IML. 2000 EGG YOLK 40T |
|----------|------------------------|
| 10385849 | IML. 2000 ALPHA LACTALBUMIN 40T |
| 10385851 | IML. 2000 BETA LACTOGLOBULIN 40T |
| 10385853 | IML. 2000 CASEIN 40T |
| 10385855 | IML. 2000 GLUTEN 40T |
| 10385856 | IML. 2000 OAT 20T |
| 10385857 | IML. 2000 LOBSTER 20T |
| 10385858 | IML. 2000 CHEDDAR CHEESE 20T |
| 10385859 | IML. 2000 CHEESE-MOLD TYPE 20T |
| 10385860 | IML. 2000 CHICKEN MEAT 20T |
| 10385861 | IML. 2000 KIWI FRUIT 20T |
| 10385862 | IML. 2000 CELERY 20T |
| 10385863 | IML. 2000 PARSLEY 20T |
| 10385864 | IML. 2000 MELON 20T |
| 10385865 | IML. 2000 LAMB 20T |
| 10385866 | IML. 2000 MUSTARD 20T |
| 10385868 | IML. 2000 CORN 40T |
| 10385869 | IML. 2000 MALT 20T |
| 10385870 | IML. 2000 MANGO 20T |
| 10385871 | IML. 2000 BANANA 20T |
| 10385872 | IML. 2000 CACAO 20T |
| 10385873 | IML. 2000 PEAR 20T |
| 10385874 | IML. 2000 PEACH 20T |
| 10385875 | IML. 2000 AVOCADO 20T |
| 10385877 | IML. 2000 RICE 40T |
| 10385882 | IML. 2000 FOOD PANEL #1 (40T) |
| 10385889 | IML. 2000 FOOD PANEL #2 (40T) |
| 10385891 | IML. 2000 FOOD PANEL #3 (40T) |
| 10385897 | IML. 2000 FOOD PANEL #5 (40T) |
| 10385899 | IML. 2000 FOOD PANEL #6 (40T) |
| 10385903 | IML. 2000 FOOD PANEL #7 (40T) |
| 10385904 | IML. 2000 JOHNSON GRASS 20T |
| 10385905 | IML. 2000 BROME GRASS 20T |
| 10385907 | IML. 2000 CULTIVATED RYE GRASS 40T |
| 10385908 | IML. 2000 VELVET GRASS 20T |
| 10385909 | IML. 2000 CULTIVATED OAT GRAS 20T |
| 10385910 | IML. 2000 CULTIVATED WHEATGRASS 20T |
| 10385911 | IML. 2000 MEADOW FOXTAIL GRASS 20T |
| 10385912 | IML. 2000 BAHIA GRASS 20T |
| 10385913 | IML. 2000 SWEET VERNAL GRASS 20T |
| 10385917 | IML. 2000 BERMUDA GRASS 40T |
| 10385919 | IML. 2000 ORCHARD GRASS 40T |
| 10385920 | IML. 2000 MEADOW FESCUE 20T |
| 10385922 | IML. 2000 PERENNIAL RYE GRAS 40T |
| 10385924 | IML. 2000 TIMOTHY GRASS 40T |
| 10385925 | IML. 2000 WILD RYE GRASS 20T |
| 10385926 | IML. 2000 CANARY GRASS 20T |

| | |
|---|---|
| 10385927 | IML. 2000 COMMON REED GRASS 20T |
| 10385929 | IML. 2000 JUNE GRASS 40T |
| 10385930 | IML. 2000 RED TOP GRASS 20T |
| 10385932 | IML. 2000 GRASS PANEL #1 (40T) |
| 10385934 | IML. 2000 GRASS PANEL #2 (40T) |
| 10385936 | IML. 2000 GRASS PANEL #3 (40T) |
| 10385938 | IML. 2000 GRASS PANEL #4 (40T) |
| 10385940 | IML. 2000 HOUSE DUST-GREER 40T |
| 10385942 | IML. 2000 HOUSE DUST HOLLISTER 40T |
| 10385948 | IML. 2000 HOUSE DUST PANEL #1 (40T) |
| 10385950 | IML. 2000 HONEY BEE VENOM 40T |
| 10385953 | IML. 2000 AMERICAN COCKROACH 20T |
| 10385955 | IML. 2000 WHITE FACED HORNET 20T |
| 10385956 | IML. 2000 YELLOW JACKET VEMOM 20T |
| 10385957 | IML. 2000 PAPER WASP VENOM 20T |
| 10385958 | IML. 2000 YELLOW HORNET 20T |
| 10385959 | IML. 2000 COCKROACH 20T |
| 10385960 | IML. 2000 IMPORTED FIRE ANT 20T |
| 10385996 | IML. 2000 LATEX 40T |
| 10385998 | IML. 2000 SUNFLOWER 20T |
| 10386011 | IML. 2000 STEMPHYLIUM BOTRYOS 20T |
| 10386012 | IML. 2000 RHIZOPUS NIGRICANS 20T |
| 10386013 | IML. 2000 AUREOBASIDIUM PULL 20T |
| 10386014 | IML. 2000 PHOMA BETAE 20T |
| 10386015 | IML. 2000 EPICOCCUM PURPUR 20T |
| 10386016 | IML. 2000 TRICHODERMA VIRIDE 20T |
| 10386017 | IML. 2000 CURVULARIA LUNATA 20T |
| 10386019 | IML. 2000 PENICILLIUM NOTAT 40T |
| 10386020 | IML. 2000 CEPHAOL. ACREM. 20T |
| 10386023 | IML. 2000 ASPERGILLUS 20T |
| 10386027 | IML. 2000 CLADOSPERIUM HERBA 40T |
| 10386030 | IML. 2000 PENICILLIUM BREVI 20T |
| 10386036 | IML. 2000 ASP. FUMIGATUS 40T |
| 10386037 | IML. 2000 HORMODENDRUM HORDE 20T |
| 10386038 | IML. 2000 MUCOR RACEMOSUS 20T |
| 10386040 | IML. 2000 CANDIDA ALBICANS 40T |
| 10386042 | IML. 2000 ALTERNARIA TENUIS 40T |
| 10386043 | IML. 2000 PITYROSPORUM ORBICU 20T |
| 10386045 | IML. 2000 HELMINTHOSPORIUM HA 20T |
| 10386046 | IML. 2000 FUSARIUM MONOLIFORM 20T |
| 10386048 | IML. 2000 MOLD PANEL #1 40T |
| 10386050 | IML. 2000 TABACCO 20T |
| 10386055 | IML. 2000 LIVE OAK TREE 20T |
| 10386056 | IML. 2000 WALNUT POLLEN 20T |
| 10386057 | IML. 2000 SYCAMORE 20T |
| 10386058 | IML. 2000 WILLOW 20T |
| 10386059 | IML. 2000 COTTONWOOD 20T |

| 10386060 | IML. 2000 WHITE ASH 20T |
|---|---|
| 10386061 | IML. 2000 WHITE PINE 20T |
| 10386063 | IML. 2000 JAPANSE CEDAR 40T |
| 10386064 | IML. 2000 EUCALYPTUS 20T |
| 10386065 | IML. 2000 ACACIA 20T |
| 10386066 | IML. 2000 MAPLE 20T |
| 10386070 | IML. 2000 MESQUITE 20T |
| 10386071 | IML. 2000 PRIVET 20T |
| 10386072 | IML. 2000 SWEET GUM 20T |
| 10386073 | IML. 2000 BAYBERRY/SWEET GALE 20T |
| 10386074 | IML. 2000 RED CEDAR 20T |
| 10386075 | IML. 2000 MELALEUCA 20T |
| 10386077 | IML. 2000 PECAN 20T |
| 10386079 | IML. 2000 ITALIAN CYPRESS 40T |
| 10386080 | IML. 2000 RED MAPLE 20T |
| 10386081 | IML. 2000 LOCUST TREE 20T |
| 10386083 | IML. 2000 ALDER 40T |
| 10386085 | IML. 2000 WHITE BALD CYPRESS 20T |
| 10386087 | IML. 2000 BIRCH 40T |
| 10386088 | IML. 2000 BRAZILIAN PEPPER TREE 20T |
| 10386092 | IML. 2000 WHITE HICKORY 20T |
| 10386094 | IML. 2000 LOBLOLLY PINE 20T |
| 10386097 | IML. 2000 HAZELNUT 40T |
| 10386098 | IML. 2000 BEECH 20T |
| 10386100 | IML. 2000 MOUNTAIN CEDAR 20T |
| 10386101 | IML. 2000 WHITE MULBERRY 20T |
| 10386102 | IML. 2000 RED MULBERRY 20T |
| 10386103 | IML. 2000 QUEEN PALM 20T |
| 10386104 | IML. 2000 AUSTRALIAN PINE 20T |
| 10386105 | IML. 2000 OAK MIX 20T |
| 10386107 | IML. 2000 OAK 40T |
| 10386112 | IML. 2000 ELM 20T |
| 10386113 | IML. 2000 POPLAR 20T |
| 10386115 | IML. 2000 OLIVE 40T |
| 10386117 | IML. 2000 TREE PANEL #1 (40T) |
| 10386119 | IML. 2000 TREE PANEL #2 (40T) |
| 10386122 | IML. 2000 TREE PANEL #4 (40T) |
| 10386126 | IML. 2000 TREE PANEL #6 (40T) |
| 10386128 | IML. 2000 TREE PANEL #7 (40T) |
| 10386130 | IML. 2000 TREE PANEL #9 (40T) |
| 10386131 | IML. 2000 LAMBS QUARTERS 20T |
| 10386132 | IML. 2000 RUSSIAN THISTLE 20T |
| 10386133 | IML. 2000 GOLDENROD 20T |
| 10386134 | IML. 2000 COCKLEBUR 20T |
| 10386135 | IML. 2000 ROUGH PIGWEED 20T |
| 10386136 | IML. 2000 SCALE 20T |
| 10386137 | IML. 2000 ROUGH MARSH ELDER 20T |

| | |
|---|---|
| 10386138 | IML. 2000 FIREBUSH 20T |
| 10386139 | IML. 2000 SHEEP SORREL 20T |
| 10386141 | IML. 2000 PARIENTARIN OFFICI 40T |
| 10386143 | IML. 2000 COMMON RAGWEED 40T |
| 10386146 | IML. 2000 NETTLE 20T |
| 10386148 | IML. 2000 PARIETARIA JUDAICA 40T |
| 10386151 | IML. 2000 WESTER RAGWEED 20T |
| 10386152 | IML. 2000 RABBIT BUSH 20T |
| 10386153 | IML. 2000 SALTBUSH 20T |
| 10386154 | IML. 2000 GIANT RAGWEED 20T |
| 10386155 | IML. 2000 COMMON SAGEBRUSH 20T |
| 10386156 | IML. 2000 DOG FENNEL 20T |
| 10386157 | IML. 2000 FALSE RAGWEED 20T |
| 10386158 | IML. 2000 WORMWOOD 20T |
| 10386159 | IML. 2000 BACCHARIS 20T |
| 10386162 | IML. 2000 MUGWORT 40T |
| 10386163 | IML. 2000 WING SCALE 20T |
| 10386164 | IML. 2000 OX-EYE DAISY 20T |
| 10386165 | IML. 2000 CARELESS WEED 20T |
| 10386166 | IML. 2000 DANDELION 20T |
| 10386168 | IML. 2000 ENGLISH PLANTA 40T |
| 10386170 | IML. 2000 WEED PANEL #1 (40T) |
| 10386172 | IML. 2000 WEED PANEL #2 (40T) |
| 10386174 | IML. 2000 WEED PANEL #3 (40T) |

# Exhibit B



# 3gAllergy™ Specific IgE Universal Kit

**For use on IMMULITE® 2000 systems**
(**IMMULITE 2000 and IMMULITE 2000 XPi automated immunoassay analyzers**)

# SIEMENS

# IMMULITE® 2000 3gAllergy™ Specific IgE Universal Kit

## English

**Intended Use:** For *in vitro* diagnostic use with the IMMULITE® 2000 Systems Analyzers — for the quantitative measurement of allergen-specific IgE in human serum, as an aid in the clinical diagnosis of IgE-mediated allergic disorders. The test results are to be used in conjunction with clinical findings and other laboratory tests.

Catalog Number: **L2KUN6** (600 tests)

Test Code: **SPE** Color: **Light Gray**

## Summary and Explanation

Many allergies are mediated by immunoglobulins of the IgE class. In sensitized individuals suffering from this immediate (atopic or anaphylactic) type of allergy, IgE molecules act as points of contact between the allergen and specialized cells that release histamine and other agents upon exposure to the allergen; this initiates the events which we recognize as allergic reactions.[5,9] When evaluated in the light of other clinical and laboratory findings, *in vitro* allergen-specific IgE tests can help the physician identify the allergen (or allergens) to which an individual is sensitive.

## Principle of the Procedure

IMMULITE 2000 3gAllergy™ Specific IgE is a solid-phase, two-step, chemiluminescent immunoassay that exploits liquid phase kinetics in a bead format.[10,11] It represents a significant advance over conventional methods relying on allergens attached to a solid-phase support, such as a paper disk.

The solid phase (bead) is coated with anti-ligand. The liquid phase consists of alkaline phosphatase (bovine calf intestine) conjugated to monoclonal murine anti-human IgE antibody in a human/nonhuman serum buffer matrix. Individual ligand-labeled allergens in liquid phase are not supplied in the kit but are required for the run.

In the first cycle, the patient sample and the ligand-labeled specific allergen are incubated together with the coated bead for 30 minutes. During this time, specific IgE in the sample binds to the ligand-labeled allergen, which in turn binds to the anti-ligand on the bead. Unbound sample is then removed by centrifugal washes.

In the second cycle, the enzyme conjugated monoclonal murine anti-human IgE antibody is added to the original reaction tube for additional 30 minutes incubation. The enzyme conjugated monoclonal murine anti-human IgE antibody binds to immobilized IgE. The unbound enzyme conjugate is removed by centrifugal washes. Finally, chemiluminescent substrate is added to the reaction tube containing the bead and the signal is generated in proportion to the bound enzyme.

**Incubation Cycles:** 2 × 30 minutes
**Time to First Result:** 65 minutes

## Specimen Collection

The use of an ultracentrifuge is recommended to clear lipemic samples.

Hemolyzed samples may indicate mistreatment of a specimen before receipt by the laboratory; hence the results should be interpreted with caution.

Centrifuging serum samples before a complete clot forms may result in the presence of fibrin. To prevent erroneous results due to the presence of f brin, ensure that complete clot formation has taken place prior to centrifugation of samples. Some samples, particularly those from patients receiving anticoagulant therapy, may require increased clotting time.

Blood collection tubes from different manufacturers may yield differing values, depending on materials and additives, including gel or physical barriers, clot activators. IMMULITE 2000 3gAllergy™

Specific IgE has not been tested with all possible variations of tube types.

**Volume Required:** 50 µL serum

**Storage:** 7 days at 2–8°C*, or 6 months at –20°C.[13]

\* Data on file at Siemens Healthcare Diagnostics.

## Warnings and Precautions

For *in vitro* diagnostic use.



**CAUTION! POTENTIAL BIOHAZARD**
Contains human source material. Each donation of human blood or blood component was tested by FDA-approved methods for the presence of antibodies to human immunodeficiency virus type 1 (HIV-1) and type 2 (HIV-2) as well as for hepatitis B surface antigen (HBsAg) and antibody to hepatitis C virus (HCV). The test results were negative (not repeatedly reactive). No test offers complete assurance that these or other infectious agents are absent; this material should be handled using good laboratory practices and universal precautions.[115-117]

**CAUTION:** This device contains material of animal origin and should be handled as a potential carrier and transmitter of disease.

| H412 | Harmful to aquatic life with long lasting effects. |
| P273, P501 | Avoid release to the environment. Dispose of contents and container in accordance with all local, regional, and national regulations. **Contains:** 2-methyl-2H-isothiazol-3-one; nonylphenol, ethoxylated; 3gAllergy Specific IgE Reagent Wedge |

**Reagents:** Store at 2–8°C. Dispose of in accordance with applicable laws.

**Caution:** This device contains material of animal origin and should be handled as a potential carrier and transmitter of disease.

Safety data sheets (MSDS) available on www.siemens.com/diagnostics.

Follow universal precautions, and handle all components as if capable of transmitting infectious agents. Source materials derived from human blood were tested and found nonreactive for syphilis; for antibodies to HIV 1 and 2; for hepatitis B surface antigen; and for antibodies to hepatitis C.

Sodium azide, at concentrations less than 0.1 g/dL, has been added as a preservative. On disposal, flush with large volumes of water to prevent the buildup of potentially explosive metal azides in lead and copper plumbing.

**Chemiluminescent Substrate:** Avoid contamination and exposure to direct sunlight. (See insert.)

**Water:** Use distilled or deionized water.

## Materials Supplied

Components are a matched set. Labels on the inside box are needed for the assay.

**3gAllergy™ Specific IgE Bead Pack (L2UN12)**
With barcode. 200 beads, coated with anti-ligand. Stable at 2–8°C until expiration date.
**L2KUN6:** 3 packs

**3gAllergy™ Specific IgE Reagent Wedge (L2UNA6)**
With barcode. 30 mL alkaline phosphatase (bovine calf intestine) conjugated to monoclonal murine anti-human IgE antibody in a human/nonhuman serum buffer matrix, dispensed equally into chambers B and C. Stable at 2–8°C until expiration date.
**L2KUN6:** 1 wedge

Before use, tear off the top of the label at the perforations, without damaging the barcode. Remove the foil seal from the top of wedge; snap the sliding cover down into the ramps on the reagent lid.

**3gAllergy™ Specific IgE Adjustors (L2UNJ3, L2UNJ4)**
Two vials (Low and High), 2.0 mL each, of human IgE in a nonhuman serum matrix, with preservative. Stable at 2–8°C for 30 days after opening, or for 6 months (aliquotted) at –20°C.
**L2KUN6:** 2 sets

Before making an adjustment, place the appropriate Aliquot Labels (supplied with the kit) on test tubes so that the barcodes can be read by the on-board reader.

### 3gAllergy™ Specific IgE Adjustor Antibody (L2UNS1)

Two tubes, 2.75 mL each of liquid, ready-to-use ligand-labeled polyclonal goat anti-human IgE antibody, with preservative. Stable at 2–8°C until expiration date. This reagent is placed in the Allergen Holder Wedge when running the Specific IgE Adjustors.
**L2KUN6:** 2 sets

### 3gAllergy™ Specific IgE (SPE) Universal Kit Controls (L2UNC1, L2UNC2)

Two vials, 2 mL each of human IgE in a nonhuman serum matrix, with preservative. Stable at 2–8°C for 30 days after opening, or for 6 months (aliquotted) at –20°C.
**L2KUN6:** 2 sets

Refer to the control insert for concentration levels.

Before use, place the appropriate Aliquot Labels (supplied with the kit) on test tubes so that the barcodes can be read by the on-board reader.

### 3gAllergy™ Specific IgE Control Antibody (L2UNS2)

Two tubes, 2.75 mL each of liquid, ready-to-use ligand-labeled polyclonal goat anti-human IgE antibody, with preservative. Stable at 2–8°C until expiration date. This reagent is placed in the Allergen Holder Wedge when running the IMMULITE 2000 IgE Controls.
**L2KUN6:** 2 sets

## Kit Components Supplied Separately

### 3gAllergy™ Specific IgE Sample Diluent (L2UNZ)

For on-board dilution of samples. One vial, concentrated (ready-to-use), human serum albumin matrix, with preservative. Storage: 30 days (after opening) at 2–8°C or 6 months (aliquotted) at –20°C. Dispose of in accordance with applicable laws.
**L2UNZ:** 25 mL

Barcode labels are provided for use with the diluent. Before use, place an appropriate label on a 16 × 100 mm test tube, so that the barcodes can be read by the on-board reader.
**L2UNZ:** 3 labels

**L2SUBM:** Chemiluminescent Substrate
**L2PWSM:** Probe Wash
**L2KPM:** Probe Cleaning Kit
**LRXT:** Reaction Tubes (disposable)
**L2AW1-3:** Allergen Holder Wedges (barcoded)
**L2AW1, 400930-02:** serially coded 1-33
**L2AW2, 400930-03:** serially coded 34-66
**L2AW3, 400930-04:** serially coded 67-99
**L2ATC:** Allergen Tube Caps
**L2ATS2:** Allergen Tube Septa

Also Available
**MC6LCM, DC1LCM, DC2LCM, L2SNCCM:** Human serum-based allergen-specific IgE controls

Also Required
Distilled or deionized water; test tubes; controls

### 3gAllergy™ Specific Allergens

Individual allergens are packaged and sold in 40 and 20 test modules containing 2.75 mL and 1.75 mL, respectively.

Each allergen tube contains specific allergens in a protein-based buffer matrix, with preservative.

Do *not* freeze. Store refrigerated: stable at 2–8°C until the expiration date marked on the label or 90 days onboard instrument. Do *not* use if signs of microbial contamination such as a cloudy appearance have been observed.

Individual allergens are intended for use with the IMMULITE 2000 systems analyzers. For a full list and catalog numbers, please refer to the 3gAllergy™ Menu.

## Assay Procedure

Note that for optimal performance, it is important to perform all routine maintenance procedures as defined in the IMMULITE 2000 Operator's Manual.

See the IMMULITE 2000 Operator's Manual for preparation, setup, dilutions, adjustment, assay and quality control procedures.

**Allergen Loading**

1 Select an open position on the Reagent Carousel through the software.

2 Replace caps on Allergen Tubes with septa. Do not invert the Allergen Tube once the septum is installed.

3 Place Allergen Tubes containing IMMULITE 2000 specific allergens, Specific IgE Adjustor Antibody, and/or Specific IgE Control Antibody in the Allergen Holder Wedge, with the barcodes facing the open side of the wedge.

4 Close the wedge and scan the allergen barcodes with the hand-held imaging scanner.

5 Once scanning is complete, load the Allergen Holder Wedge into the reagent carousel.

6 Repeat this procedure to load subsequent Allergen Holder Wedges.

The Allergen Holder Wedge **must** be scanned prior to installation into the instrument to ensure correct instrument operation. Removing or replacing any vials within the allergen wedge will require rescanning of the wedge with the barcode scanner to update the allergen information.

**Recommended Adjustment Interval:** 2 weeks

**Quality Control Samples:** To monitor adjustment, use the controls supplied with the kit. Specific allergen controls are also available, see "Kit Components Supplied Separately" section. The specific allergen controls (DC1LCM, DC2LCM, MC6LCM and L2SNCCM) should be tested to monitor allergen performance.

Follow government regulations or accreditation requirements for quality control frequency.

## Interpretation of Results

**Individual Allergen Results:**
The class number is an indication of the amount of endogenous IgE specific for the selected allergen. Quantitative values (kU/L) and interpretation of class results for two scoring systems (standard and extended) are provided in the tables below.[16]

The **standard** classification system utilizes the following class cutoffs:

| Class | kU/L | Reactivity for Individual Allergen |
|---|---|---|
| 0* | < 0.10 | Absent or ND[†] |
| | 0.10–0.34 | Very Low |
| I | 0.35–0.69 | Low |
| II | 0.70–3.49 | Moderate |
| III | 3.50–17.49 | High |
| IV | 17.5–52.49 | |
| V | 52.5–99.99 | Very High |
| VI | ≥ 100 | |

\* Class 0 in the standard system signifies: not detectable by second-generation assays.

[†] ND: not detectable by IMMULITE 2000 3gAllergy.

The **extended** classification system utilizes the following class cutoffs.

| Class | kU/L | Reactivity for Individual Allergen |
|---|---|---|
| 0 | < 0.10 | Absent or ND[†] |
| 0/1 | 0.10–0 24 | Very Low |
| I | 0.25–0 39 | Low |
| II | 0.40–1 29 | Moderate |
| III | 1.30–3 89 | High |
| IV | 3.90–14 99 | |
| V | 15.00–24.99 | Very High |
| VI | ≥ 25 | |

[†] ND: not detectable by IMMULITE 2000 3gAllergy.

The choice of classification systems can be made by the user within the IMMULITE 2000 operational software.

Consider these limits as *guidelines* only. Each laboratory should establish its own reference ranges.

## Limitations

A definitive clinical diagnosis should not be made solely on the basis of an *in vitro* allergen-specific IgE result. Diagnosis should be made by the physician only after all clinical and laboratory findings have been evaluated.[2,4]

*In vitro* allergen-specific IgE results should not be used as a definitive guide to selecting an initial dose for immunotherapy. A skin test with the proposed initial dilution of the allergenic extract should be performed first to demonstrate the patient's ability to tolerate the dose.

In food allergy, circulating IgE antibodies may remain undetectable if directed towards allergens which are revealed or altered during processing or digestion and which therefore do not exist in the original food for which the patient is tested.[1,3]

Identical results for different allergens may not be associated with clinically equivalent manifestations, due to differences in IgE-binding capacity.[6]

The user should be aware of the possibility of clinical crossreactivity within an allergen family.[7,8]

Cross reactivity between different fish allergens can be traced to the homologous epitopes present in fish parvalbumin proteins. Therefore, fish sensitized patients may be sensitive to more than one species of fish.[40–44]

In drug or occupational allergy, a negative result may be observed in patients who are hypersensitive to drug or occupational allergens in the following circumstances:

- The symptoms are mediated without IgE involvement.

- The sample is collected less than 2 weeks after the allergic reaction. The test should be repeated after 2 weeks to confirm results.

- The sample is collected a long period of time after the last allergic reaction occurred. It has been shown that the IgE antibody concentration decreases with time.

The following special considerations apply to latex allergy testing:

- The possibility of clinical crossreactivity exists between latex and certain foods including avocado, banana, chestnut, and kiwi.[12]

- Since the latex assay measures allergen-specific IgE, type IV delayed reaction or irritation from latex will not be detected.

Class 0 results for insect venoms indicate absent or very low levels of circulating venom-specific IgE ant bodies. Such results do not preclude existence of current or future clinical hypersensitivity to insect sting.

Heterophilic antibodies in human serum can react with the immunoglobulins included in the assay components causing interference with *in vitro* immunoassays. [See Boscato LM, Stuart MC. Heterophilic antibodies: a problem for all immunoassays. Clin Chem 1988:34: 27-33.] Samples from patients routinely exposed to animals or animal serum products can demonstrate this type of interference potentially causing an anomalous result. These reagents have been formulated to minimize the risk of interference; however, potential interactions between rare sera and test components can occur. For diagnostic purposes, the results obtained from this assay should always be used in combination with the clinical examination, patient medical history, and other findings.

## Performance Data

See Tables and Graphs for data representative of the assay's performance. Results are expressed in kU/L. (Unless otherwise noted, all were generated on serum samples collected in tubes without gel barriers or clot-promoting additives.)

IMMULITE 2000 3gAllergy Specific IgE has been the subject of a number of published studies.[14,15]

**IMMULITE 2000 calibrator assay range:** 0.10–100 kU/L (2nd WHO IRP 75/502 human serum IgE). Please see the measuring range for the Individual Specific Allergens in the Linearity section.

**Analytical Sensitivity:** Limit of Blank (highest value expected for a sample with no analyte; determined in accordance with CLSI EP17-A[35]): 0.03 kU/L

Limit of Detection (lowest detectable concentration; determined in accordance with CLSI EP-17-A[35]): 0.10 kU/L

**Functional Sensitivity:** (concentration with 20% coefficient of variation (CV) determined in accordance with CLSI EP5-A2[36]): 0.20 kU/L

**Precision:** Samples were assayed in duplicate over the course of 20 days, two runs per day, for a total of 40 runs and 80 replicates. (See *Precision* table for representative data.)

**Linearity:** Individual specific allergen linearity was tested at various concentrations, and was limited by the availability of antibodies present in patient serum. Each specific allergen demonstrated linearity within a particular tested range. Representative data of 10 individual allergens are provided. (See *Linearity* table for representative data.)

**Specificity:** The antibodies are highly specific for human IgE and exhibit no crossreactivity to other human Immunoglobulin classes.

**Bilirubin:** Presence of conjugated and unconjugated bilirubin in concentrations up to 200 mg/L has no effect on results, within the precision of the assay.

**Biotin:** Specimens that contain biotin at a concentration of 5 ng/mL demonstrate a less than or equal to 10% change in results. Biotin concentrations greater than this may lead to falsely depressed results for patient samples.

Results from patients taking biotin supplements or receiving high-dose biotin therapy should be interpreted with caution due to possible interference with this test.

**Hemolysis:** Presence of hemoglobin in concentrations up to 500 mg/dL has no effect on results, within the precision of the assay.

**Lipemia:** Presence of triglycerides in concentrations up to 3,000 mg/dL has no effect on results, within the precision of the assay.

**Method Comparison:** The assay was compared to AlaSTAT Microplate Allergen-Specific IgE, a standard scoring assay, on 7,520 samples.

| IMMULITE 2000 \ AlaSTAT Microplate | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|
| 6 | | | 1 | 3 | 31 | 42 | 303 |
| 5 | | | | 11 | 76 | 33 | 35 |
| 4 | | | 3 | 178 | 168 | 26 | 10 |
| 3 | | 1 | 292 | 604 | 49 | 2 | 2 |
| 2 | 16 | 229 | 886 | 98 | | | |
| 1 | 108 | 172 | 94 | 4 | | | |
| 0 | 3,912 | 118 | 11 | 2 | | | |

Total Agreement: 97%
Relative Sensitivity: 96%
Relative Specificity: 97%
Total Identical: 81%
Class 1 Identical: 99%
Class 2 Identical: 100%

Means of Class Scores:
1.29 (AlaSTAT)
1.37 (IML 2000)

The same data was analyzed in a regression analysis with the following results:

(IML 2000) = 0 989 (AlaSTAT) + 1.21 kU/L
r = 0.87

Means:
8.53 kU/L (AlaSTAT)
9.64 kU/L (IMMULITE 2000)

**Clinical Performance:** Samples were assayed in singlicate across 111 specific allergens (See allergen list). In common allergens, 30 or more Atopic samples and 100 or more non-Atopic samples were usually tested per specific individual allergens. Clinical diagnosis was based on patient donor history and/or skin test data.[17–34, 37–114]

#### Individual Performance Data on Representative Allergens

| F403 | Clinical Diagnosis | |
|---|---|---|
| IMMULITE 2000 | Atopic | Non-atopic |
| Positive | 17 | 0 |
| Nega ive | 27 | 100 |
| Total | 44 | 100 |

Sensitivity: 39% [99] (17/44) (95%CI: 24–53%)
Specificity: 100% (100/100)

| F102 | Clinical Diagnosis | |
|---|---|---|
| IMMULITE 2000 | Atopic | Non-atopic |
| Positive | 17 | 1 |
| Negative | 27 | 128 |
| Total | 44 | 129 |

Sensitivity: 39% [100–101] (17/44) (95%CI: 24–53%)
Specificity: 99% (128/129) (95%CI: 98–100%)

| T27 | Clinical Diagnosis | |
|---|---|---|
| IMMULITE 2000 | Atopic | Non-atopic |
| Positive | 36 | 8 |
| Negative | 12 | 145 |
| Total | 48 | 153 |

Sensitivity: 75% (36/48) (95%CI: 63–87%)
Specificity: 95% (145/153) (95%CI: 91–98%)

| T211 | Clinical Diagnosis | |
|---|---|---|
| IMMULITE 2000 | Atopic | Non-atopic |
| Positive | 31 | 9 |
| Negative | 17 | 144 |
| Total | 48 | 153 |

Sensitivity: 65% (31/48) (95%CI: 51–78%)
Specificity: 94% (144/153) (95%CI: 90–98%)

| W43 | Clinical Diagnosis | |
|---|---|---|
| IMMULITE 2000 | Atopic | Non-atopic |
| Positive | 33 | 3 |
| Negative | 15 | 97 |
| Total | 48 | 100 |

Sensitivity: 69% (33/48) (95%CI: 56–82%)
Specificity: 97% (97/100) (95%CI: 94–100%)

| A89 | Clinical Diagnosis | |
|---|---|---|
| IMMULITE 2000 | Atopic | Non-atopic |
| Positive | 37 | 5 |
| Negative | 6 | 95 |
| Total | 43 | 100 |

Sensitivity: 86% (373/43) (95%CI: 76–96%)

Specificity: 95% (95/100) (95%CI: 91–99%)

In the tables above a negative result is considered < 0.10 kU/L. A positive result is ≥ 0.10 kU/L. (See *Clinical Performance* table for additional representative data.)

### Clinical Performance Table

| | Allergen | Sensitivity* | Specificity |
|---|---|---|---|
| 1 | T41 | 67% | 93% |
| 2 | W75 | 58% | 98% |
| 3 | F21[102] | 44% | 91% |
| 4 | F300 | 53% | 90% |
| 5 | F207 | 52% | 100% |
| 6 | F287[103] | 42% | 93% |
| 7 | F263 | 86% | 97% |
| 8 | K84 | 56% | 92% |
| 9 | F360 | 64% | 91% |
| 10 | F303 | 50% | 92% |
| 11 | M305 | 61% | 100% |
| 12 | D201 | 57% | 96% |
| 13 | E201 | 70% | 96% |
| 14 | A174 | 98% | 99% |
| 15 | O201 | 56% | 100% |
| 16 | A89 | 86% | 95% |

**Allergens List**: Common Sagebrush (W43), Wingscale (W75), Red Maple (T27), White Hickory (T41), Sweet Gum (T211), Red Cedar (T219), American Cockroach (I206), Bayberry/Sweet Gale (T218), Baccharis (W67), Dog Fennel (W46), Locust Tree (T208), Live Oak (T103), *Hormodendrum Hordei* (M45), *Stemphylium Solani* (M88), Red Mulberry (T71), Privet (T210), White Bald Cypress (T37), Egg (F245), Cashew (F202), Clam (F207), Oyster (F290), Pistachio (F203), Scallop (F338), Walnut (F256), Sunflower Seed (K84), Aspergillus niger (M207), Cephalosporium acremonium (M202), Poplar (T96), Careless Weed (W82), Saltbush (W37), Black Pepper (F280), Broccoli (F260), Cabbage (F216), Cheese Mold Type (F82), Cherry (F242), Chestnut (F299), Chocolate (F105), Coffee (F221), Cucumber (F244), Grape (F259), Grapefruit (F209), Haddock (F42), Lamb (F88), Lemon (F208), Lima Bean (F182), Peach (F95), Pear (F94), Pineapple

(F210), Plum (F255), Pumpkin (F225), Red Snapper (F381), Sole (F337), Spinach (F214), Sweet Potato (F54), Trout (F204), Turkey Meat (F284), Watermelon (F329), Brewer's Yeast (F403), Cantaloupe (F102), Cinnamon (F220), Flounder (F147), Green Bean (F315), Green Pepper (F263), Halibut (F303), Mushroom (F212), Pinto Bean (F300), Red Kidney Bean (F287), Sugar Cane (F21), and Yogurt (F360), Aureobasidium pullulans (M12), Blomia tropicalis (D201), Brazilian Peppertree (T401), Budgerigar feathers (E78), Canary Feathers (E201), Chicken Feathers (E85), Loblolly Pine (T43), nAsp r 1 (A3050), nCan f 1 (A174), nDer f 1 (A295), nDer f 2 (A302), nDer p 1 (A310), nDer p 2 (A316), nFel d 1 (A345), nPen m 1 (F351), Parrot Feathers (E91), Penicillium brevi-compactum (M305), Pigeon Droppings (E7), Rabbit Bush (W46), Tobacco (O201), Turkey Feathers (E89), Apricot (F237), Asparagus (F261), Blueberry (F288), Cauliflower (F291), Chili Pepper (F279), Chub Mackerel (F50), Ginger (F270), Lime (F306), Perch (F65), Whey (F236), Basil (F269), Cacao (F93), Oregano (F283), Parsley (F86), Pine Nut (F253), and Vanilla (F234), nOle e 1 (A482), nArt v 1 (A753), Dog Serum Albumin (nCan f 3)(E221), Cat Serum Albumin (nFel d 2)(E220), and nBet v 1 (A89).

*Data on file at Siemens Healthcare Diagnostics.

# Tables and Graphs

## Precision (kU/L)

|   | Mean | Within-Run | | Total | |
|---|------|------|------|------|------|
|   |      | SD   | %CV  | SD   | %CV  |
| 1  | 0.5 | 0.05 | 10  | 0.06 | 12  |
| 2  | 0.7 | 0.07 | 10  | 0.08 | 11  |
| 3  | 1.1 | 0.04 | 3.6 | 0.05 | 4.5 |
| 4  | 1.1 | 0.08 | 7.3 | 0.08 | 7.3 |
| 5  | 1.5 | 0.08 | 5.3 | 0.09 | 6.0 |
| 6  | 1.6 | 0.15 | 9.4 | 0.16 | 10  |
| 7  | 1.8 | 0.10 | 5.6 | 0.10 | 5.6 |
| 8  | 1.9 | 0.14 | 7.4 | 0.16 | 8.4 |
| 9  | 2.1 | 0.12 | 5.7 | 0.14 | 6.7 |
| 10 | 2.4 | 0.10 | 4.2 | 0.14 | 5.8 |
| 11 | 3.0 | 0.15 | 5.0 | 0.17 | 5.7 |
| 12 | 3.4 | 0.12 | 3.5 | 0.16 | 4.7 |
| 13 | 3.6 | 0.20 | 5.6 | 0.24 | 6.7 |
| 14 | 4.1 | 0.28 | 6.8 | 0.32 | 7.8 |
| 15 | 6.1 | 0.28 | 4.6 | 0.36 | 5.9 |
| 16 | 8.9 | 0.44 | 4.9 | 0.56 | 6.3 |
| 17 | 9.5 | 0.53 | 5.6 | 0.65 | 6.8 |
| 18 | 10  | 0.36 | 3.6 | 0.50 | 5.0 |
| 19 | 12  | 0.56 | 4.7 | 0.76 | 6.3 |
| 20 | 15  | 0.67 | 4.5 | 0.67 | 4.5 |
| 21 | 19  | 1.7  | 8.9 | 1.9  | 10  |
| 22 | 43  | 1.9  | 4.4 | 2.6  | 6.0 |

## Linearity (kU/L)

| Allergen | Regression Equation | Range Tested |
|---|---|---|
| F403 | y = 0.99x + 0.03 | 0.15–8.6 |
| Slope 95% CI | | 0.991–0.997 |
| Intercept 95% CI | | 0 0185–0.046 |
| | | |
| W75 | y = 1.00x − 0.10 | 0.33–24.4 |
| Slope 95% CI | | 0.981–1.015 |
| Intercept 95% CI | | −0.252–0.056 |
| | | |
| T37 | y = 1.01x + 0.14 | 0.26–29.1 |
| Slope 95% CI | | 0.985–1.028 |
| Intercept 95% CI | | −0.082–0.353 |
| | | |
| W67 | y = 1.00x − 0.11 | 0.42–33.9 |
| Slope 95% CI | | 0.979–1.019 |
| Intercept 95% CI | | −0.358–0.131 |
| | | |
| F207 | y = 1.01x + 0.31 | 0.53–54.5 |
| Slope 95% CI | | 0.979–1.034 |
| Intercept 95% CI | | −0.209–0.827 |
| | | |
| I206 | y = 1.00x + 0.05 | 0.10–6.1 |
| Slope 95% CI | | 0.979–1.017 |
| Intercept 95% CI | | 0.006–0.091 |
| | | |
| M207 | y = 0.99x + 0.03 | 0.10–9.1 |
| Slope 95% CI | | 0.970–1.007 |
| Intercept 95% CI | | −0.032–0.083 |
| | | |
| K84 | y = 1.00x + 0.02 | 0.17–6.3 |
| Slope 95% CI | | 0.986–1.012 |
| Intercept 95% CI | | −0.059–0.014 |
| | | |
| F360 | y = 1.01x + 0.10 | 0.11–8.0 |
| Slope 95% CI | | 0.967–1.050 |
| Intercept 95% CI | | −0.019–0.215 |
| | | |
| F303 | y = 0.99x + 0.01 | 0.17–2.9 |
| Slope 95% CI | | 0.962–1.015 |
| Intercept 95% CI | | −0.025–0.045 |

## References

1) Aas K. The diagnosis of hypersensitivity to ingested foods. Clin Allergy 1978;8:39–50. 2) Barbee RA, et al. Longitudinal changes in allergen skin test reactivity in a community population sample. J Allergy Clin Immunol 1987;79:16–24. 3) Bleumink E. Food allergy: the chemical nature of the substance eliciting symptoms. World Rev Nutr Diet 1970;12: 505–70. 4) Bloch K, Salvaggio J. Use and interpretation of diagnostic immunologic laboratory tests. JAMA 1982; 246:2734–58. 5) Halpern GM. Markers of human allergic disease. J Clin Immunoassay 1983;6:131–8. 6) Lichtenstein LM, et al. IgE antibody measurements in ragweed hay fever; relaionship to clinical severity and the results of immunotherapy. J Clin Invest 1973; 52:472–82. 7) Lowenstein H. Cross reactions among pollen antigens. Allergy 1980;35:198–200. 8) Weber RW, Nelson HS. Pollen allergens and their interrelationships. Clin Rev Allergy 1985;3: 291–318. 9) Wide L, Bennich H, Johansson SGO. Diagnosis of allergy by an *in vitro* test for allergen antibodies. Lancet 1967;2:1105–7. 10) El Shami AS, Alaba O. Liquid-phase *in vitro* allergen-specific IgE assay with *in situ* immobilization. Adv Biosci 1989;74:191–201. 11) Alaba O, El Shami AS. Evaluation of non-specific IgE binding: comparison of two *in vitro* allergen assays. Adv Biosci 1989;74:203–14. 12) Pecquet C. IgE-mediated allergy to latex in 80 patients. Presented at the XVth European Congress of Allergology and Clinical Immunology, Paris, 12 May 1992. 13) Tietz NW, editor. Clinical guide to laboratory tests. 3rd ed. Philadelphia: WB Saunders, 1995:358. 14) Li TM, Chuang T, Tse S, Hovanec-Burns D, El Shami AS. Development and validation of a third generation allergen-specific IgE assay on the continuous random access IMMULITE 2000 analyzer. Ann Clin Lab Sci 2004;34(1):67-74. Available via www.AnnClinLabSci.org. 15) Guilloux L, Hamberger C. Évaluation du dosage des IgE spécifiques sur l'IMMULITE® 2000 DPC. Immuno-analyse & Biologie Spécialisée. 2004;19(1):71-80. Available via www.sciencedirect.com. 16) Hoffman DR. Comparison of methods of performing the radioallergosorbent test: Phadebas, Fada-Nalebuff, and Hoffman protocols. Ann Allergy. 1980 Dec;45(6):343-6. 17) Bernstein IL, et al. Allergy Diagnostic Testing: An Updated Practice Parameter. Ann Allergy Asthma Immunol 2008;100(3) Sup 3:S1-S148. 18) Weber RW. Cross-reactivity of pollen allergens: impact on allergen immunotherapy. Ann Allergy Asthma Immunol 2007;99:203-212. 19) Weber RW. Cross-reactivity of Pollen Allergens. Curr Allergy Asthma Rep 2004;4:401-408. 20) White JF, Bernstein DI. Key pollen allergens in North America. Ann Allergy Asthma Immunol 2003;91:425-435. 21) Compes E, et al. Hypersensitivity to black locust (Robinia pseudoacacia) pollen: "allergy mirages". Ann Allergy Asthma Immunol 2006; 96(4):586-592.

22) Willison L, et al. Pistachio vicilin, Pis v 3, is immunoglobulin E-reactive and cross-reactive wi h the homologous cashew allergen, Ana o 1. Clinical and Experimental Allergy 2008;38: 1229-38. 23) Clark A, Ewan P. Good prognosis, clinical features, and circumstances of peanut and tree nut reactions in children treated by a specialist allergy center. Journal Allergy Clinical Immunology 2008;122(2):286-9. 24) Barre et al. Vicilin allergens of peanut and tree nuts (walnut, hazelnut, and cashew nut) share structurally related IgE-binding epitopes. Molecular Immunology 2008;45:1231-40. 25) Maloney J, Rudengren M, Ahlstedt S, Bock S, Sampson H. The use of serum-specific IgE measurements for diagnosis of peanut, tree nut, and see allergy. . Journal Allergy Clinical Immunology 2008;122(1):145-151. 26) Goetz D, Whisman B, Goetz. Cross-reactivity among edible nuts: double immunodiffusion, crossed immunoelectrophoresis, and human specific IgE serologic surveys. Ann Allergy Asthma Immunology 2005;95:45-52. 27) http://www.allergen.org/Allergen.aspx International Union of Immunological Societies – Allergen Nomenclature Sub-Committee. 28) Leung P, et al. IgE reactivity against a cross-reactive allergen in crustacean and mollusca: evidence for tropomyosin as the common allergen. J Allergy Clin Immunol 1996;98(5): 954-61. 29) Aalberse R, Akkerdaas J, van Ree R. Cross-reactivity of IgE antibodies to allergens. Allergy 2001;56:478-90. 30) Sidenius K, Hallas T, Poulsen L, Mosbech H. Allergen cross-reactivity between house-dust mites and other invertebrates. Allergy 2001;56:723-33. 31) Ferreira F, Hawranek P, Gruber N, Wopfner N. Allergic cross-reactivity: from gene to the clinic. Allergy 2004;59:243-67. 32) Zhang Y, Hiroaki M, Morita E. Case report: cross-reactivity among shrimp, crab and scallops in a patient wi h a seafood allergy. J Dermatology 2006;3:174-77. 33) Purohit A, et al. role of tropomyosin as a cross-reacting allergen in sensitization to cockroach in patients from Martinique (French Caribbean Island) with a respiratory allergy to mite and a food allergy to crab and shrimp. Europ Ann Allergy and Clin Immunol 2007;39:85-88. 34) Nakmura A, et al. Effect of maillard reaction on allergenicity of scallop tropomyosin. Journal of Agricultural and Food Chemistry 2005;53:7559-64. 35) CLSI. Protocols for the Determination of Limits of Detection and Quantitation; Approved Guideline. CLSI document EP17-A Vol. 24 (No. 34). CLSI, 940 West Valley Road, Suite 1400, Wayne, Pennsylvania 19087-1898, USA, 2004. 36) Evaluation of Precision Performance of Quantitative Measurement Methods; Approved Guideline-Second Edition. CLSI Document EP5-A2. CLSI, 940 West Valley Road, Suite 1400, Wayne, Pennsylvania 19087-1898, USA, 2004. 37) Kelly JD, Hlywka JJ, Hefle SL. Identification of sunflower seed IgE-binding proteins. Int Arch Allergy Immunol 2000;121: 19-24. 38) Poltronieri P, et al. Identification and Characterisation of the IgE-Binding Proteins 2S Albumin and Conglutin γ in Almond (Prunus dulcis) Seeds. Int Arch Allergy Immunol 2002;128:97-104. 39) Mayaud-Marret C, Malod-Panisset A, Bidat E. Allergy to Sunflower Oil and Seeds. Rev Fr Allergol Immunol Clin 2006;46(2):92-94. 40) Chapman JA, Bernstein IL, Lee RE, Oppenheim J, Nicklas RA, Portnoy JM, Sicherer SH, Schuller DE, Spector SL, Khan D, Lang D, Simon RA, Tilles SA, Blessing-Moore J, Wallace D, Teuber SS. Food allergy: a practice parameter. Allergy Asthma Immunol 2006; 96(3):S1-S68. 41) Helbling A, McCants ML, Musmand JJ, Schwartz HJ, Lehrer SB. Immunopathogenesis of fish allergy: identifica ion of fish-allergic adults by skin test and radioallergosorbent test. Ann Allergy Asthma Immunol 1996; 77(1):48-54. 42) Mazzeo MF, DeGiulio B, Guerriero G, Ciarcia G, Malorni A, Russo GL, Sicilano RA. Fish au hentication by MALDI-TOF mass spectrometry. J Agri Food Chem 2008; 56:11071-11076. 43) Pascual C, Martin Esteban M, Crespo JF. Fish allergy: evaluation of the importance of cross-reactivity. J Pediatr 1992; 121(5):S29-S34. 44) Rosmilah M, Shahnaz M, Masita A, Noormalin A, Jamaludin M. Identification of major allergens of two species of local snappers: Lutjanus argentimaculatus (merah/ red snapper) and Lutjanus johnii (jenahak/ golden snapper). Trop Biomed 2005; 22(2):171-177. 45) Eriksson NE. Food sensitivity reported by patients with asthma and hay fever. A relationship between food sensitivity and birch pollen-allergy and between food sensitivity and acetylsalicylic acid intolerance. Allergy. 1978 Aug;33(4):189-96. 46) Zacharisen MC. Severe allergy to chicken meat. Wisconsin Medical Journal. 2006 Jul;105(5):50-52. 47) O'Neil C, Helbling AA, Lehrer SB. Allergic Reactions to Fish. Clin Rev Allergy. 1993 Summer;11(2):183-200. 48) Osterballe M, Hansen TK, Mortz CG, Høst A, Bindslev-Jensen C. The prevalence of food hypersensitivity in an unselected population of children and adults. Pediatr Allergy Immunol. 2005 Nov;16(7):567-73. 49) Pereira B, Venter C, Grundy J, Clayton CB, Arshad SH, Dean T. Prevalence of sensitization to food allergens, reported adverse reaction to foods, food avoidance, and food hypersensitivity among teenagers. J Allergy Clin Immunol. 2005 Oct;116(4):884-92. 50) Geraldes L, Carrapatoso I, Santos A, Rodrigues F, Todo-Bom A, Faria E, Chieira C. Sensitization patterns in legume hypersensitivity. A study from the central region of Portugal. Rev Port Imunoalergologia 2009;17(1):37-55. 51) Jensen LB, Pedersen MH, Skov PS, Poulsen LK, Bindslev-Jensen C, Andersen SB, Torp AM. Peanut cross-reacting allergens in seeds and sprouts of a range of legumes. Clin Exp Allergy. 2008 Dec;38(12):1969-77. Epub 2008 Oct 28. 52) Ibáñez MD, Martínez M, Sánchez JJ, Fernández-Caldas E. Legume cross-reactivity. Allergol Immunopathol (Madr). 2003 May-Jun;31(3):151-61. 53) Airola K, Petman L, Makinen-Kiljunen S. Clustered sensitivity to fungi: anaphylactic reactions caused by

ingestive allergy to yeasts. Ann Allergy Asthma Immunol. 2006 Sep;97(3):294-7. 54) Cholez C, Contet-Audonneau N, Schmutz JL, Virion JM, Barbaud A. Role of Malassezia species in head and neck dermatitis. Rev Fr Allergol Immunol Clin 2004; 44(4):372-378. 55) Dauby PA, Whisman BA, Hagan L. Cross-reactivity between raw mushroom and molds in a patient with oral allergy syndrome. Ann Allergy Asthma Immunol. 2002 Sep;89(3):319-21. 56) Herrera-Mozo I, Ferrer B, Luís Rodriguez-Sanchez J, Juarez C. Description of a novel panallergen of cross-reactivity between moulds and foods. Immunol Invest. 2006;35(2):181-97. 57) Lopez-Torrejon G, Crespo JF, Sanchez-Monge R, Sanchez-Jimenez M, Alvarez J, Rodriguez J, Salcedo G. Allergenic reactivity of he melon profilin Cuc m 2 and its iden ification as major allergen. Clin Exp Allergy 2005; 35(8):1065-1072. 58) Calkhoven PG, Aalbers M, Koshte VL, Pos O, Oei HD, Aalberse RC. Cross-reactivity among birch pollen, vegetables and fruits as detected by IgE antibodies is due to at least three distinct cross-reactive structures. Allergy. 1987 Jul;42(5):382-90. 59) Caballero T, Martín-Esteban M. Association between pollen hypersensitivity and edible vegetable allergy: a review. J Investig Allergol Clin Immunol. 1998 Jan-Feb;8(1):6-16. 60) Van Ree R, Voitenko V, van Leeuwen WA, Aalberse RC. Profilin is a cross-reactive allergen in pollen and vegetable foods. Int Arch Allergy Immunol 1992;98(2): 97-104. 61) Chakraborty P, Gupta-Bhattcharya S, Chowdhury I, Majumdar MR, CHanda S. Differences in concentrations of allergenic pollens and spore at different heights on an agricultural farm in West Bengal, India. Ann Agric Environ Med. 2001;8(2):123-30. 62) Agata H, Kondo N, Yomo A, Muraki T, Shinoda S, Fukutomi O, Kato Y, Nishida T, Shinbara M, Orii T. Sensitization to sugar cane pollen in Okinawan allergic children. Asian Pac J Allergy Immunol 1994 Dec;12(2):151-154. 63) Riggioni O, Montiel M, Fonseca J, Jaramillo O, Carvajal E, Rosencwaig P, Colmenares A. Type I hypersensitivity to gramineae pollen by species in allergic rhinitis pa ients. Rev Biol Trop. 1994 Apr; 42 Supple 1:71-6, 20. 64) De Maat-Bleeker F, van Dijk AG, Berrens L. Allergy to egg yolk possibly induced by sensitization to bird serum antigens. Ann Allergy 1985;54(3):245-8. 65) De Blay Frederic, Hoyet C, Candolfi E, Thierry R, Pauli G. Identification of Alpha Livetin as a Cross Reacting Allergen in a Bird-Egg Syndrome. Allergy and Asthma Proceedings. 1994 Mar-Apr;15(2):77-78. 66) Todd A, Coan RM, Allen A. Pigeon breeder's lung: pigeon intestinal mucin, an antigen distinct from pigeon IgA. Clin. Exp. Immunol. 1991;85:453-8. 67) Arruda LK, Platts-Mills TA, Fox JW, Chapman MD. Aspergillus fumigatus allergen I, a major IgE-binding protein, is a member of the mitogillin family of cytotoxins. J Exp Med 1990; 172(5):1529-1532. 68) Itabashi H, Hosoe T, Toyasaki N, Imai T, Adachi M, Kawai K. Allergen activity of xerophilic fungus, Aspergillus restrictus. Arerugi. 2007 Feb;56(2):101-8.

69) Mari A, Schneider P, Wally V, Breitenbach M, Simon-Nobbe B. Sensitization to fungi: epidemiology, comparative skin tests, and IgE reactivity of fungal extracts. Clin Exp Allergy. 2003 Oct;33(10):1429-38. 70) Armentia A, Bartolome B, Puyo M, Paredes C, Calderon S, Asensio T, Valentin del Villar MD. Tobacco as an allergen in bronchial disease. Ann Allergy Asthma Immunol 2007; 98(4):329-336. 71) Mittermann I, Voronin V, Heberle-Bors E, Valenta R. Identification of a villin-related tobacco protein as a novel cross-reactive plant allergen. FEBS Lett 2005; 579(17):3807-3813. 72) Ortega N, Quiralte J, Blanco C, Castillo R, Alvarez MJ, Carrillo T. Tobacco allergy: demonstration of cross-reactivity with other members of Solanaceae family and mugwort pollen. Ann Allergy Asthma Immunol 1999; 82(2):194-197. 73) Takai T, Kato T, Hatanaka H, Inui K, Nakazawa T, Ichikawa S, et al. Modulation of Allergenicity of Major House Dust Mite Allergens Der f 1 and Der p 1 by Interaction with an Endogenous Ligand. J Immunol 2009 Dec 15;183(12):7958-65. 74) Ichikawa S, Takai T, Yashiki T, Takahashi S, Okumura K, Ogawa H, et al. Lipopolysaccharide binding of the mite allergen Der f 2. 2009 Sep;14(9):1055-65. 75) Cruz LM, Lopez-Malpica F, Diaz AM. Analysis of cross-reactivity between group 1 allergens from mites. P R Health Sci J 2008; 27(2):163-170. 76) Puerta L, Lagares A, Mercado D, Fernandez-Caldas E, Caraballo L. Allergenic composition of the mite Suidasia medanensis and cross-reactivity with Blomia tropicalis. Allergy 2005; 60(1):41-47. 77) Tsai JJ, Yi FC, Chua KY, Liu YH, Lee BW, Cheong N. Identification of the major allergenic components in Blomia tropicalis and the relevance of the specific IgE in asthmatic patients. Ann Allergy Asthma Immunol 2003; 91(5):485-489. 78) Kaiser L, Velickovic TC, Badia-Martinez D, Adedoyin J, Thunberg S, Hallen D, et al.. Structural Characterization of the Tetrameric form of the Major Cat Allergen Fel d 1. J Mol Biol 2007; 370(4):714-727. 79) Konieczny A, Morgenstern JP, Bizinkauskas CB, Lilley CH, Brauer AW, Bond JF, et al. The major dog allergens, Can f 1 and Can f 2, are salivary lipocalin proteins: cloning and immunological characterization of the recombinant forms. Immunology. 1997 Dec;92(4):577-86. 80) Cabañas R, López-Serrano MC, Carreira J, Ventas P, Polo F, Caballero MT, et al. Importance of albumin in cross-reactivity among cat, dog and horse allergens. J Investig Allergol Clin Immunol. 2000 Mar-Apr;10(2):71-7. 81) Spitzauer S, Pandjaitan B, Mühl S, Ebner C, Kraft D, Valenta R, Rumpold H. Major cat and dog allergens share IgE epitopes. J Allergy Clin Immunol. 1997 Jan;99(1 Pt 1):100-106. 82) Yagami A, Nakazawa Y, Suzuki K, Matsunaga K. Curry spice allergy associated with pollen-food allergy syndrome and latex fruit-syndrome. J Dermatol 2009; 36(1):45-49. 83) Van der Walt A, Lopata AL, Nieuwenhuizen NE, Jeebhay MF. Work-Related Allergy and Asthma in Spice Mill Workers – The Impact of

Processing Dried Spices on IgE Reactivity Patterns. Int Arch Allergy Immunol 2010;152:271-278. 84) Ebner C, Jensen-Jarolim E, Leitner A, Breiteneder H. Characterization of allergens in plant-derived spices: Apiaceae spices, pepper (Piperaceae), and paprika (bell peppers, Solanaceae). 85) Marzban G, Mansfeld A, Herndl A, Jager S, Stoyanova M, Hemmer W, Katinger H, Laimer M. Direct evidence for the presence of allergens in Rosaceae fruit tree pollen. Aerobiologia 2006; 22(3):237-245. 86) Asero R, Monsalve R, Barber D. Profilin sensitization detected in the office by skin prick test: a study of prevalence and clinical relevance of profilin as a plant food allergen. Clin Exp Allergy 2008; 38(6):1033-1037. 87) Díaz-Perales A, Tabar AI, Sánchez-Monge R, García BE, Gómez B, Barber D, Salcedo G. Characterization of asparagus allergens: A relevant role of lipid transfer proteins. Journal of Allergy and Clinical Immunology. Nov 2002; 110(5):790-796. 88) Gebhardt C, Vieths S, Gubesch M, Averbeck M, Simon JC, Treudler R. 10 kDa lipid transfer protein: the main allergenic structure in a German patient with anaphylaxis to blueberry. Allergy 2009; 64(3):498-499. 89) Marzban G, Mansfeld A, Hemmer W, Stoyanova E, Katinger H, Laimer da Câmara Machado M. Fruit cross-reactive allergens: a theme of uprising interest for consumers' heal h. BioFactors 2006;23(4):235-241. 90) Palacin A, Cumplido J, Figueroa J, Ahrazem O, Sanchez-Monge R, Carrillo T, Salcedo G, Blanco C. Cabbage lipid transfer protein Bra o 3 is a major allergen responsible for cross-reactivity between plant foods and pollens. J Allergy Clin Immunol 2006; 117(3):1423-1429. 91) Ahrazem O, Ibáñez MD, López-Torrejón G, Sánchez-Monge R, Sastre J, Lombardero M, Barber D, Salcedo G. Lipid Transfer Proteins and Allergy to Oranges. Int Arch Allergy Immunol 2005;137:201-210. 92) Hernandez E, Quirce S, Villalba M. Cuesta J, Sastre J. Anaphylaxis Caused by Cauliflower. J Invest Allergol Clin Immunol 2005; 15(2):158-159. 93) Moneret-Vautrin DA, Morisset M, Lemerdy P, Croizier A, Kanny G. Food allergy and IgE sensitization caused by spices: CICBAA data (based on 589 cases of food allergy). Allerg Immunol (Paris). 2002 Apr;34(4):135-40. 94) Xu H, Delling M, Jun JC, Clapham DE. Oregano, thyme and clove-derived flavors and skin sensitizers activate specific TRP channels. Nat Neurosci. 2006 May;9(5):628-35. 95) Benito M,  Jorro G, Morales C, Peláez A, Fernández A. Labiatae Allergy: Systemic Reactions Due to Ingestion of Oregano and Thyme. Annf Allergy Asthma Immunol, Volume 76, Number 5, May 1996 , pp. 416-418(3). 96) Niinimäki A, Hannuksela M, Mäkinen-Kiljunen S. Skin prick tests and in vitro immunoassays with native spices and spice extracts. Ann Allergy Asthma Immunol. 1995 Sep;75(3):280-6. 97) Becker CG, Van Hamont N, Wagner M. Tobacco, cocoa, coffee, and ragweed: cross-reacting allergens that activate factor-XII-dependent  pathways. Blood. 1981 Nov;58(5):861-7. 98) Hammerstone JF, Lazarus SA, Mitchell AE, Rucker R, Schmitz HH. Identification of procyanidins in cocoa (Theobroma cacao) and chocolate using high-performance liquid chromatography/mass spectrometry. J Agric Food Chem. 1999 Feb;47(2):490-6. 99) Cholez C, Contet-Audonneau N, Schmutz JL, Virion JM, Barbaud A. Role of Malassezia species in head and neck dermatitis. Rev Fr Allergol Immunol Clin 2004; 44(4):372-378. 100) García Ortiz JC, Cosmes Martín P, Lopez-Asunolo A. Melon sensitivity shares allergens with Plantago and grass pollens. Allergy. 1995 Mar;50(3):269-73. 101) Calkhoven PG, Aalbers M, Koshte VL, Pos O, Oei HD, Aalberse RC. Cross-reactivity among birch pollen, vegetables and fruits as detected by IgE antibodies is due to at least three distinct cross-reactive structures. Allergy. 1987 Jul;42(5):382-90 102) Chakraborty P, Gupta-Bhattcharya S, Chowdhury I, Majumdar MR, Chanda S. Differences in concentrations of allergenic pollens and spore at different heights on an agricultural farm in West Bengal, India. Ann Agric Environ Med. 2001;8(2):123-30. 103) Geraldes L, Carrapatoso I, Santos A, Rodrigues F, Todo-Bom A, Faria E, Chieira C. Sensitization patterns in legume hypersensitivity. A study from the central region of Portugal. Rev Port Imunoalergologia 2009;17(1):37-55. 104) Spieksma FT, Charpin H, Nolard N, Stix E. City spore concentrations in the European Economic Community (EEC). IV. Summer weed pollen (Rumex, Plantago, Chenopodiaceae, Artemisia, 1976 and 1977. Clin Allergy. 1980 May;10(3):319-29. 105) Gioulekas D, Papkosta D, Damialis A, Spieksma F, Giouleka P, Patakas D. Allergenic pollen records (15 years) and sensitization in patients with respiratory allergy in Thessaloniki, Greece. Allergy. 2004 Feb;59(2):174-84. 106) Scala E, Alessandri C, Bernardi ML, Ferrara R, Palazzo P, Pomponi D, et al. Cross-sectional survey on immunoglobulin E reactivity in 23,077 subjects using an allergenic molecule-based microarray detection system. Clin Exp Allergy. 2010;40(6):911-21. 107) Spitzauer S, Pandjaitan B, Soregi G, Muhl S, Ebner C, Kraft D, et al. IgE cross-reactivities against albumins in pa ients allergic to animals. J Allergy Clin Immunol. 1995 Dec;96(5):951-9. 108) Spitzauer S, Schweiger C, Sperr W, Pandjaitan B, Valent P, Muhl S, et al. Molecular characterization of dog albumin as a cross-reactive allergen. J Allergy Clin Immunol. 1994 Mar; 93:614-27. 109) Spitzauer S, Schweiger C, Anrather J, Ebner C, Scheiner O, Kraft D. Characterisa ion of dog allergens by means of immunoblotting. Int Arch Allergy Immunol. 1993;100:60-7. 110) Van Ree R, Van Leeuwen A, Bulder I, Bond J, Aalberse R. Purified natural and recombinant Fel d 1 and cat albumin in in vitro diagnostics for cat allergy. J Allergy Clin Immunol. 1999;104:1223-30. 111) Lindgren S, Belin L, Dreborg S, Einarsson R, Phlman I. Breed-specific dog-dandruff allergens. J Allergy Clin Immunol. 1988;82(2):196-204. 112) Mattson L, Lundgren T, Everberg H, Larsson H, Lidholm J. Prostatic kallikrein: A new major dog allergen.

J Allergy Clin Immunol. 2009;123:362-8.
113) Hilger C, Kohnen M, Grigioni F, Lehners C, Hentges F. Allergic cross-reactions between cat and pig serum albumin. Study at the protein and DNA levels. Allergy. 1997;52:179-87.
114) Cabanas R, Lopez-Serrano M, Carreira J, Ventas P, Polo F, Caballero M, et al. Importance of albumin in cross-reactivity among cat, dog and horse allergens. J Investig Allergol Clin Immunol. 2000;10(2):71-7. 115) Centers for Disease Control. Update: Universal precautions for preven ion of transmission of human immunodeficiency virus, hepatitis B virus and other bloodborne pathogens in healthcare settings. MMWR, 1988;37:377–82, 387–8.
116) Clinical and Laboratory Standards Institute (formerly NCCLS). Protection of Laboratory Workers From Occupa ionally Acquired Infections; Approved Guideline - Third Edition. Wayne, PA: Clinical and Laboratory Standards Institute; 2005. NCCLS Document M29-A3.
117) Federal Occupational Safety and Health Administration, Bloodborne Pathogens Standard, 29 CFR 1910.1030.

**Technical Assistance**

In the United States, contact Siemens Healthcare Diagnostics Technical Services department. Tel: 877.229.3711.

www.siemens.com/diagnostics

The Quality System of Siemens Heal hcare Diagnostics Products Ltd. is certified to ISO 13485.

IMMULITE and 3gAllergy are trademarks of Siemens Healthcare Diagnostics.

© 2017 Siemens Healthcare Diagnostics. All rights reserved.

Made in: UK

 Siemens Healthcare
Diagnostics Products Ltd.
Glyn Rhonwy, Llanberis,
Gwynedd LL55 4EL
United Kingdom

2017-12-13

PIL2KUND – 31

**Changes in this Edition:**
cc#EU23262: The date was removed from the ISO standard - Was: ISO 13485:2003 Is: ISO 13485. cc#EU23292: Bio in interference information was added to the Performance Data section.

## Understanding the Symbols

The following symbols may appear on the product labeling:

**Symbol Definition**

 *In vitro* diagnostic medical device

 Catalog Number

 Manufacturer

 Consult instructions for use

 Caution! Potential Biohazard

 Temperature limitation (2–8°C)

 Upper limit of temperature (≤ -20°C)

 Lower limit of temperature (≥ 2°C)

 Do not freeze (> 0°C)

 Do not reuse

 Keep away from sunlight

 Batch code

 Contains sufficient for (n) tests

 Date format (year-month)

 Use by

| | **Symbol** | **Definition** |
|---|---|---|
|  | | Health Hazard |
|  | | Exclamation Mark |
|  | | Corrosion |
|  | | Skull and Crossbones |
|  | | Environment |
| | **BEAD PACK** | Bead Pack |
| | **TEST UNIT** | Test Unit |
| | **REAG WEDGE** **REAG WEDGE A** **REAG WEDGE B** **REAG WEDGE D** | Reagent Wedge |
| | **ADJUSTOR** | Adjustor |
| | **ADJUSTOR L** | Adjustor, low |
| | **ADJUSTOR H** | Adjustor, high |
| | **ADJUSTOR AB** | Adjustor Antibody |

| **Symbol** | **Definition** |
|---|---|
| **DIL** | Sample Diluent |
| **CONTROL** **CONTROL 1** **CONTROL 2** **CONTROL 3** | Control |
| **CONTROL +** | Positive Control |
| **CONTROL + L** | Low Positive Control |
| **CONTROL −** | Negative Control |
| **CONTROL AB** | Control Antibody |
| **PRE A** **PRE B** | Pretreatment Solution |
| **DITHIOTHREITOL** | Dithiothreitol Solution |
| **BORATE-KCN BUF** | Borate-KCN Buffer Solution |

Exhibit C

**UNITED STATES COURT OF INTERNATIONAL TRADE**          **FORM 1**

| |
|---|
| **SIEMENS HEALTHCARE DIAGNOSTICS,** **A SUBSIDIARY OF SIEMENS MEDICAL SOLUTIONS USA, INC.** |
| **Plaintiff,** |
| **v.** |
| **UNITED STATES,**          **Defendant.** |

**S U M M O N S**

CIT Case No. 19-00090

**TO:**    The Attorney General and the Secretary of Homeland Security:

   **PLEASE TAKE NOTICE** that a civil action has been commenced pursuant to 28 U.S.C. § 1581(a) to contest denial of the protest specified below (and the protests listed in the attached schedule).

_____
Clerk of the Court

**PROTEST**

| | |
|---|---|
| Port of Entry: Indianapolis | Date Protest Filed: January 13, 2017 |
| Protest Number: 4110-17-100015 | Date Protest Denied: January 16, 2019 |
| Importer: Siemens Healthcare Diagnostics, a subsidiary of Siemens Medical Solutions USA, Inc. | |
| Category of Merchandise: Allergen Panels | |

**ENTRIES INVOLVED IN ABOVE PROTEST**

| Entry Number | Date of Entry | Date of Liquidation | Entry Number | Date of Entry | Date of Liquidation |
|---|---|---|---|---|---|
| 101-4724659-9 | 1/22/2016 | 11/25/2016 | | | |
| | | | | | |
| * | | | | | |

 **\* Please see attached schedule for information concerning additional liquidation entries.**

Port Director,
Service Port of Indianapolis
Indianapolis International Airport
6801 Pierson Drive
Indianapolis, IN 46241

Robert Lafrankie, Esq.
Aaron M. Marx, Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, DC 20004
(202) 624-2500
rlafrankie@crowell.com
amarx@crowell.com

Address of Customs Port in
Which Protest was Denied

Name, Address, Telephone Number
and E-mail Address of Plaintiff's Attorney

## CONTESTED ADMINISTRATIVE DECISION

| Appraised Value of Merchandise | | |
|---|---|---|
| | Statutory Basis | Statement of Value |
| Appraised: | | |
| Protest Claim: | | |

| Classification, Rate or Amount | | | | |
|---|---|---|---|---|
| | Assessed | | Protest Claim | |
| Merchandise | Paragraph or Item Number | Rate | Paragraph or Item Number | Rate |
| Allergen Panels | 3824.99.9297 | 5.0% | 3822.00.5090 | 0.0% |

### Other

State Specifically the Decision [as Described in 19 U.S.C. § 1514(a)] and the Protest Claim:

**Decision**: Liquidation of subject entries and classification of certain allergen panels under HTSUS subheading 3824.99.9297, dutiable at 5.0 percent ad valorem.

**Protest Claim**: Customs should reliquidate subject entries and reclassify the subject products under HTSUS subheading 3822.00.5090, duty free.

The issue which was common to all such denied protests:

Refusal to reliquidate entries and classify subject products under HTSUS subheading 3822.00.5090, the provision for "Diagnostic or laboratory reagents on a backing and prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006; certified reference materials: Diagnostic or laboratory reagents on a backing, prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006: Other: Other," duty free.

Every denied protest included in this civil action was filed by the same above-named importer, or by an authorized person in the importer's behalf. The category of merchandise specified above was involved in each entry of merchandise included in every such denied protest. The issue or issues stated above were common to all such denied protests. All such protests were filed and denied as prescribed by law. All liquidated duties, charges or exactions have been paid, and were paid at the port of entry unless otherwise shown.

_____
*Signature of Plaintiff's Attorney*

_____
*Date*   6/7/19

Form 1-3

## SCHEDULE OF PROTESTS

**Port of Indianapolis, IN - 4110**

Port of Entry

| Protest Number | Date Protest Filed | Date Protest Denied | Entry Number | Date of Entry | Date of Liquidation |
|---|---|---|---|---|---|
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 10151760584 | 11/18/2016 | 09/29/2017 |
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 10151902608 | 12/05/2016 | 10/20/2017 |
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 10152454369 | 12/09/2016 | 10/20/2017 |
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 10152521159 | 12/09/2016 | 10/20/2017 |
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 10152559191 | 12/15/2016 | 10/27/2017 |
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 10152583423 | 12/14/2016 | 10/27/2017 |
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 10152720793 | 12/22/2016 | 11/03/2017 |
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 10152784625 | 12/29/2016 | 11/13/2017 |
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 10153606215 | 02/24/2017 | 01/05/2018 |
| 4110-18-100016 | 3/5/2018 | 1/16/19 | 10154268056 | 04/11/2017 | 02/23/2018 |
| 4110-18-100016 | 3/5/2018 | 1/16/19 | 10153962758 | 03/22/2017 | 02/02/2018 |
| 4110-18-100016 | 3/5/2018 | 1/16/19 | 10154051361 | 03/28/2017 | 02/09/2018 |
| 4110-18-100019 | 4/2/2018 | 1/16/19 | 10154530992 | 5/2/2017 | 3/16/2018 |
| 4110-18-100019 | 4/2/2018 | 1/16/19 | 10154601470 | 5/4/2017 | 3/16/2018 |
| 4110-18-100019 | 4/2/2018 | 1/16/19 | 10154679211 | 5/10/2017 | 3/23/2018 |
| 4110-18-100019 | 4/2/2018 | 1/16/19 | 10154816847 | 5/19/2017 | 3/30/2018 |
| 4110-18-100023 | 4/30/2018 | 1/16/19 | 10155382674 | 6/1/2017 | 4/13/2018 |
| 4110-18-100023 | 4/30/2018 | 1/16/19 | 10155458987 | 6/7/2017 | 4/20/2018 |
| 4110-18-100023 | 4/30/2018 | 1/16/19 | 10155588767 | 6/15/2017 | 4/27/2018 |
| 4110-18-100029 | 6/1/2018 | 1/16/19 | 10155786908 | 6/29/2017 | 5/11/2018 |
| 4110-18-100029 | 6/1/2018 | 1/16/19 | 10155883275 | 7/5/2017 | 5/18/2018 |
| 4110-18-100029 | 6/1/2018 | 1/16/19 | 10155930738 | 7/10/2017 | 5/25/2018 |
| 4110-18-100029 | 6/1/2018 | 1/16/19 | 10155948813 | 7/11/2017 | 5/25/2018 |
| 4110-18-100038 | 7/2/2018 | 1/16/19 | 10156087199 | 07/31/2017 | 06/01/2018 |
| 4110-18-100038 | 7/2/2018 | 1/16/19 | 10156251456 | 08/10/2017 | 06/15/2018 |
| 4110-18-100038 | 7/2/2018 | 1/16/19 | 10156419707 | 08/21/2017 | 06/22/2018 |
| 4110-18-100038 | 7/2/2018 | 1/16/19 | 10156430274 | 08/21/2017 | 06/22/2018 |
| 4110-18-100038 | 7/2/2018 | 1/16/19 | 10156460933 | 08/29/2017 | 06/29/2018 |
| 4110-18-100038 | 7/2/2018 | 1/16/19 | 10156524522 | 08/29/2017 | 06/29/2018 |
| 4110-18-100044 | 7/31/2018 | 1/16/19 | 10156577272 | 8/21/2017 | 7/6/2018 |
| 4110-18-100044 | 7/31/2018 | 1/16/19 | 10156763831 | 9/1/2017 | 7/13/2018 |
| 4110-18-100044 | 7/31/2018 | 1/16/19 | 10156897886 | 9/11/2017 | 7/27/2018 |
| 4110-18-100044 | 7/31/2018 | 1/16/19 | 10156912214 | 9/13/2017 | 7/27/2018 |
| 4110-18-100044 | 7/31/2018 | 1/16/19 | 10156947350 | 9/14/2017 | 7/27/2018 |
| 4110-18-100044 | 7/31/2018 | 1/16/19 | 10156972325 | 9/15/2017 | 7/27/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 10157052762 | 9/21/2017 | 08/03/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 10157093287 | 9/22/2017 | 08/10/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 10157109950 | 9/25/2017 | 08/10/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 10157198946 | 9/29/2017 | 08/10/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 10157242363 | 10/03/2017 | 08/17/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 10157327321 | 10/09/2017 | 08/24/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 10157328386 | 10/10/2017 | 08/24/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 10157349911 | 10/11/2017 | 08/24/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 10157452277 | 10/17/2017 | 08/31/2018 |

(As amended Sept. 30, 2003, eff. Jan. 1, 2004; Nov. 28, 2006, eff. Jan. 1, 2007; Dec. 7, 2010, eff. Jan. 1, 2011.)

## SCHEDULE OF PROTESTS

**Port of Indianapolis, IN - 4110**

Port of Entry

| Protest Number | Date Protest Filed | Date Protest Denied | Entry Number | Date of Entry | Date of Liquidation |
|---|---|---|---|---|---|
| 4110-18-100048 | 10/2/2018 | 1/16/19 | 10157555707 | 10/24/2017 | 09/07/2018 |
| 4110-18-100048 | 10/2/2018 | 1/16/19 | 10157710344 | 11/03/2017 | 09/14/2018 |
| 4110-18-100048 | 10/2/2018 | 1/16/19 | 10157737727 | 11/06/2017 | 09/21/2018 |
| 4110-18-100048 | 10/2/2018 | 1/16/19 | 10157780560 | 11/09/2017 | 09/21/2018 |
| 4110-18-100048 | 10/2/2018 | 1/16/19 | 10157870072 | 11/14/2017 | 09/28/2018 |
| 4110-18-100054 | 10/31/2018 | 1/16/19 | 10157988510 | 11/22/2017 | 10/5/2018 |
| 4110-18-100054 | 10/31/2018 | 1/16/19 | 10158045187 | 11/22/2017 | 10/5/2018 |
| 4110-18-100054 | 10/31/2018 | 1/16/19 | 10158146787 | 11/29/2017 | 10/12/2018 |
| 4110-18-100054 | 10/31/2018 | 1/16/19 | 10158257790 | 12/06/2017 | 10/19/2018 |
| 4110-18-100054 | 10/31/2018 | 1/16/19 | 10158330563 | 12/08/2017 | 10/19/2018 |
| 4110-18-100054 | 10/31/2018 | 1/16/19 | 10158361303 | 12/11/2017 | 10/26/2018 |
| 4110-18-100057 | 12/4/2018 | 1/16/19 | 10158408146 | 12/18/2017 | 11/02/2018 |
| 4110-18-100057 | 12/4/2018 | 1/16/19 | 10158527416 | 12/22/2017 | 11/02/2018 |
| 4110-18-100057 | 12/4/2018 | 1/16/19 | 10158586834 | 12/28/2017 | 11/09/2018 |
| 4110-19-100065 | 2/1/2019 | 5/29/19 | 10159303437 | 02/16/2018 | 01/18/2019 |
| 4110-19-100065 | 2/1/2019 | 5/29/19 | 10159396183 | 02/22/2018 | 01/18/2019 |
| 4110-19-100065 | 2/1/2019 | 5/29/19 | 10159434281 | 02/27/2018 | 01/25/2019 |
| 4110-19-100065 | 2/1/2019 | 5/29/19 | 10159437516 | 02/26/2018 | 01/25/2019 |
| 4110-19-100065 | 2/1/2019 | 5/29/19 | 10159479773 | 02/28/2018 | 01/25/2019 |
| 4110-19-100065 | 2/1/2019 | 5/29/19 | 10159482595 | 02/28/2018 | 01/25/2019 |
| 4110-19-100065 | 2/1/2019 | 5/29/19 | 10159612381 | 03/09/2018 | 02/01/2019 |

(As amended Sept. 30, 2003, eff. Jan. 1, 2004; Nov. 28, 2006, eff. Jan. 1, 2007; Dec. 7, 2010, eff. Jan. 1, 2011.)

Form 1-5

## SCHEDULE OF PROTESTS

**Port of Chicago, IL – 3901**
**5600 Pearl Street**
**Rosemont, IL 60018**
_____
Port of Entry

| Protest Number | Date Protest Filed | Date Protest Denied | Entry Number | Date of Entry | Date of Liquidation |
|---|---|---|---|---|---|
| 4110-18-100057 | 12/4/2018 | 1/16/19 | 33619817310 | 12/19/2017 | 11/02/2018 |
| 4110-18-100057 | 12/4/2018 | 1/16/19 | 33673972167 | 08/20/2018 | 11/30/2018 |

(As amended Sept. 30, 2003, eff. Jan. 1, 2004; Nov. 28, 2006, eff. Jan. 1, 2007; Dec. 7, 2010, eff. Jan. 1, 2011.)

Form 1-6

**SCHEDULE OF PROTESTS**

**Port of Memphis, TN (Federal Express) – 2095**
**2813 Business Park Drive, Building I**
**Memphis, TN 38118**

Port of Entry

| Protest Number | Date Protest Filed | Date Protest Denied | Entry Number | Date of Entry | Date of Liquidation |
|---|---|---|---|---|---|
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 79984421003 | 11/22/2016 | 10/06/2017 |
| 4110-18-100003 | 1/30/2018 | 1/16/19 | 79994238413 | 02/07/2017 | 12/22/2017 |
| 4110-18-100019 | 4/2/2018 | 1/16/19 | 79908173138 | 5/10/2017 | 3/23/2018 |
| 4110-18-100029 | 6/1/2018 | 1/16/19 | 79916276865 | 7/4/2017 | 5/18/2018 |
| 4110-18-100038 | 7/2/2018 | 1/16/19 | 79919776853 | 08/10/2017 | 06/08/2018 |
| 4110-18-100047 | 9/21/2018 | 1/16/19 | 79931431925 | 10/14/2017 | 08/31/2018 |

(As amended Sept. 30, 2003, eff. Jan. 1, 2004; Nov. 28, 2006, eff. Jan. 1, 2007; Dec. 7, 2010, eff. Jan. 1, 2011.)

| Protest Number | Entry Number | Importer Number | Port of Entry Code | Entry Date | Liquidation Date | Total Entry Line Value | HTS Classification at Liquidation | Duty Paid at Liquidation |
|---|---|---|---|---|---|---|---|---|
| 4110-17-100015 | 10147246599 | 95-280218200 | 4110 | 1/22/2016 | 11/25/2016 | $764 | 3824.90.9295 | $38.20 |
| 4110-18-100003 | 10151760584 | 95-280218200 | 4110 | 11/18/2016 | 9/29/2017 | $2,000 | 3824.90.9295 | $100.00 |
| 4110-18-100003 | 10151902608 | 95-280218200 | 4110 | 12/5/2016 | 10/20/2017 | $61,562 | 3824.90.9295 | $3,078.10 |
| 4110-18-100003 | 10152454369 | 95-280218200 | 4110 | 12/9/2016 | 10/20/2017 | $34,165 | 3824.90.9295 | $1,708.25 |
| 4110-18-100003 | 10152521159 | 95-280218200 | 4110 | 12/9/2016 | 10/20/2017 | $47,618 | 3824.90.9295 | $2,380.90 |
| 4110-18-100003 | 10152559191 | 95-280218200 | 4110 | 12/15/2016 | 10/27/2017 | $720,616 | 3824.90.9295 | $36,030.80 |
| 4110-18-100003 | 10152583423 | 95-280218200 | 4110 | 12/14/2016 | 10/27/2017 | $48 | 3824.90.9295 | $2.40 |
| 4110-18-100003 | 10152720793 | 95-280218200 | 4110 | 12/22/2016 | 11/3/2017 | $719 | 3824.90.9295 | $35.95 |
| 4110-18-100003 | 10152784625 | 95-280218200 | 4110 | 12/29/2016 | 11/13/2017 | $341,293 | 3824.90.9295 | $17,064.65 |
| 4110-18-100003 | 10153606215 | 95-280218200 | 4110 | 2/24/2017 | 1/5/2018 | $1,390 | 3824.90.9295 | $69.50 |
| 4110-18-100003 | 79984421003 | 95-280218200 | 2095 | 11/22/2016 | 10/6/2017 | $935 | 3824.90.9295 | $46.75 |
| 4110-18-100003 | 79994238413 | 95-280218200 | 2095 | 2/7/2017 | 12/22/2017 | $1,352 | 3824.90.9295 | $67.60 |
| 4110-18-100016 | 10154268056 | 95-280218200 | 4110 | 4/11/2017 | 2/23/2018 | $4,299 | 3824.90.9295 | $214.95 |
| 4110-18-100016 | 10153962758 | 95-280218200 | 4110 | 3/22/2017 | 2/2/2018 | $4,368 | 3824.90.9295 | $218.40 |
| 4110-18-100016 | 10154051361 | 95-280218200 | 4110 | 3/28/2017 | 2/9/2018 | $441 | 3824.90.9295 | $22.05 |
| 4110-18-100019 | 10154530992 | 95-280218200 | 4110 | 5/2/2017 | 3/16/2018 | $5,859 | 3824.90.9295 | $292.95 |
| 4110-18-100019 | 10154601470 | 95-280218200 | 4110 | 5/4/2017 | 3/16/2018 | $3,289 | 3824.90.9295 | $164.45 |
| 4110-18-100019 | 10154679211 | 95-280218200 | 4110 | 5/10/2017 | 3/23/2018 | $13,943 | 3824.90.9295 | $697.15 |
| 4110-18-100019 | 10154816847 | 95-280218200 | 4110 | 5/19/2017 | 3/30/2018 | $22,318 | 3824.90.9295 | $1,115.90 |
| 4110-18-100019 | 79908173138 | 95-280218200 | 2095 | 5/10/2017 | 3/23/2018 | $3,551 | 3824.90.9295 | $177.55 |
| 4110-18-100023 | 10155382674 | 95-280218200 | 4110 | 6/1/2017 | 4/13/2018 | $27,274 | 3824.90.9295 | $1,363.70 |
| 4110-18-100023 | 10155458987 | 95-280218200 | 4110 | 6/7/2017 | 4/20/2018 | $37,242 | 3824.90.9295 | $1,862.10 |
| 4110-18-100023 | 10155588767 | 95-280218200 | 4110 | 6/15/2017 | 4/27/2018 | $31,723 | 3824.90.9295 | $1,586.15 |
| 4110-18-100029 | 10155786908 | 95-280218200 | 4110 | 6/29/2017 | 5/11/2018 | $44,669 | 3824.90.9295 | $2,233.45 |
| 4110-18-100029 | 79916276865 | 95-280218200 | 2095 | 7/4/2017 | 5/18/2018 | $805 | 3824.90.9295 | $40.25 |
| 4110-18-100029 | 10155883275 | 95-280218200 | 4110 | 7/5/2017 | 5/18/2018 | $28,013 | 3824.90.9295 | $1,400.65 |
| 4110-18-100029 | 10155930738 | 95-280218200 | 4110 | 7/10/2017 | 5/25/2018 | $44,126 | 3824.90.9295 | $2,206.30 |
| 4110-18-100029 | 10155948813 | 95-280218200 | 4110 | 7/11/2017 | 5/25/2018 | $26,690 | 3824.90.9295 | $1,334.50 |
| 4110-18-100038 | 10156087199 | 95-280218200 | 4110 | 7/19/2017 | 6/1/2018 | $37,312 | 3824.90.9295 | $1,865.60 |
| 4110-18-100038 | 10156251456 | 95-280218200 | 4110 | 7/31/2017 | 6/15/2018 | $65,152 | 3824.90.9295 | $3,257.60 |
| 4110-18-100038 | 10156419707 | 95-280218200 | 4110 | 8/9/2017 | 6/22/2018 | $46,302 | 3824.90.9295 | $2,315.10 |
| 4110-18-100038 | 10156430274 | 95-280218200 | 4110 | 8/9/2017 | 6/22/2018 | $27,924 | 3824.90.9295 | $1,396.20 |
| 4110-18-100038 | 10156460933 | 95-280218200 | 4110 | 8/17/2017 | 6/29/2018 | $39,691 | 3824.90.9295 | $1,984.55 |
| 4110-18-100038 | 10156524522 | 95-280218200 | 4110 | 8/16/2017 | 6/29/2018 | $192 | 3824.90.9295 | $9.60 |
| 4110-18-100038 | 79919776853 | 95-280218200 | 2095 | 7/27/2017 | 6/8/2018 | $363 | 3824.90.9295 | $18.15 |
| 4110-18-100044 | 10156577272 | 95-280218200 | 4110 | 8/21/2017 | 7/6/2018 | $42,867 | 3824.90.9295 | $2,143.35 |
| 4110-18-100044 | 10156763831 | 95-280218200 | 4110 | 9/1/2017 | 7/13/2018 | $35,633 | 3824.90.9295 | $1,781.65 |
| 4110-18-100044 | 10156897886 | 95-280218200 | 4110 | 9/11/2017 | 7/27/2018 | $39,699 | 3824.90.9295 | $1,984.95 |
| 4110-18-100044 | 10156912214 | 95-280218200 | 4110 | 9/13/2017 | 7/27/2018 | $144 | 3824.90.9295 | $7.20 |
| 4110-18-100044 | 10156947350 | 95-280218200 | 4110 | 9/14/2017 | 7/27/2018 | $50,434 | 3824.90.9295 | $2,521.70 |
| 4110-18-100044 | 10156972325 | 95-280218200 | 4110 | 9/15/2017 | 7/27/2018 | $7,090 | 3824.90.9295 | $354.50 |
| 4110-18-100047 | 10157052762 | 95-280218200 | 4110 | 9/21/2017 | 8/3/2018 | $56,983 | 3824.90.9295 | $2,849.15 |
| 4110-18-100047 | 10157093287 | 95-280218200 | 4110 | 9/22/2017 | 8/10/2018 | $96 | 3824.90.9295 | $4.80 |
| 4110-18-100047 | 10157109950 | 95-280218200 | 4110 | 9/25/2017 | 8/10/2018 | $39,500 | 3824.90.9295 | $1,975.00 |
| 4110-18-100047 | 10157198946 | 95-280218200 | 4110 | 9/29/2017 | 8/10/2018 | $102,700 | 3824.90.9295 | $5,135.00 |
| 4110-18-100047 | 10157242363 | 95-280218200 | 4110 | 10/03/2017 | 8/17/2018 | $13,651 | 3824.90.9295 | $682.55 |
| 4110-18-100047 | 10157327321 | 95-280218200 | 4110 | 10/09/2017 | 8/24/2018 | $3,627 | 3824.90.9295 | $181.35 |
| 4110-18-100047 | 10157328386 | 95-280218200 | 4110 | 10/10/2017 | 8/24/2018 | $95,761 | 3824.90.9295 | $4,788.05 |
| 4110-18-100047 | 10157349911 | 95-280218200 | 4110 | 10/11/2017 | 8/24/2018 | $614 | 3824.90.9295 | $30.70 |
| 4110-18-100047 | 10157452277 | 95-280218200 | 4110 | 10/17/2017 | 8/31/2018 | $49,992 | 3824.90.9295 | $2,499.60 |
| 4110-18-100047 | 79931431925 | 95-280218200 | 2095 | 10/14/2017 | 8/31/2018 | $536 | 3824.90.9295 | $26.80 |
| 4110-18-100048 | 10157555707 | 95-280218200 | 4110 | 10/24/2017 | 09/07/2018 | $15,721 | 3824.90.9295 | $786.05 |
| 4110-18-100048 | 10157710344 | 95-280218200 | 4110 | 11/03/2017 | 09/14/2018 | $77,752 | 3824.90.9295 | $3,887.60 |
| 4110-18-100048 | 10157737727 | 95-280218200 | 4110 | 11/06/2017 | 09/21/2018 | $12,371 | 3824.90.9295 | $618.55 |
| 4110-18-100048 | 10157780560 | 95-280218200 | 4110 | 11/09/2017 | 09/21/2018 | $48 | 3824.90.9295 | $2.40 |
| 4110-18-100048 | 10157870072 | 95-280218200 | 4110 | 11/14/2017 | 09/28/2018 | $47,250 | 3824.90.9295 | $2,362.50 |
| 4110-18-100054 | 10157988510 | 95-280218200 | 4110 | 11/22/2017 | 10/5/2018 | $192 | 3824.90.9295 | $9.60 |
| 4110-18-100054 | 10158045187 | 95-280218200 | 4110 | 11/22/2017 | 10/5/2018 | $43,299 | 3824.90.9295 | $2,164.95 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4110-18-100054 | 10158146787 | 95-280218200 | 4110 | 11/29/2017 | 10/12/2018 | $30,426 | 3824.90.9295 | $1,521.30 |
| 4110-18-100054 | 10158257790 | 95-280218200 | 4110 | 12/06/2017 | 10/19/2018 | $88,218 | 3824.90.9295 | $4,410.90 |
| 4110-18-100054 | 10158330563 | 95-280218200 | 4110 | 12/08/2017 | 10/19/2018 | $34,471 | 3824.90.9295 | $1,723.55 |
| 4110-18-100054 | 10158361303 | 95-280218200 | 4110 | 12/11/2017 | 10/26/2018 | $96 | 3824.90.9295 | $4.80 |
| 4110-18-100057 | 10158408146 | 95-280218200 | 4110 | 12/18/2017 | 11/02/2018 | $192 | 3824.90.9295 | $9.60 |
| 4110-18-100057 | 10158527416 | 95-280218200 | 4110 | 12/22/2017 | 11/02/2018 | $89,332 | 3824.90.9295 | $4,466.60 |
| 4110-18-100057 | 10158586834 | 95-280218200 | 4110 | 12/28/2017 | 11/09/2018 | $32,115 | 3824.90.9295 | $1,605.75 |
| 4110-18-100057 | 33619817310 | 95-280218200 | 3901 | 12/19/2017 | 11/02/2018 | $5,680 | 3824.90.9295 | $284.00 |
| 4110-18-100057 | 33673972167 | 95-280218200 | 3901 | 08/20/2018 | 11/30/2018 | $65,912 | 3824.90.9295 | $3,295.60 |
| 4110-19-100064 | 10158910174 | 95-280218200 | 4110 | 1/23/2018 | 12/07/2018 | $72,487 | 3824.90.9295 | $3,624.35 |
| 4110-19-100064 | 10158934695 | 95-280218200 | 4110 | 1/23/2018 | 12/07/2018 | $13,031 | 3824.90.9295 | $651.55 |
| 4110-19-100064 | 10158937904 | 95-280218200 | 4110 | 1/23/2018 | 12/07/2018 | $31,246 | 3824.90.9295 | $1,562.30 |
| 4110-19-100064 | 10159042811 | 95-280218200 | 4110 | 1/30/2018 | 12/14/2018 | $45,469 | 3824.90.9295 | $2,273.45 |
| 4110-19-100064 | 10159126598 | 95-280218200 | 4110 | 2/5/2018 | 12/21/2018 | $96 | 3824.90.9295 | $4.80 |
| 4110-19-100064 | 10159135755 | 95-280218200 | 4110 | 2/5/2018 | 12/21/2018 | $47,015 | 3824.90.9295 | $2,350.75 |
| | | | | | | | | |
| Total | | | | | | | | $150,987.70 |

# Exhibit D

Siemens Healthcare Diagnostics Inc

In accordance with 19CFR 174.11(b)(2) and 19CFR 174.24, we are protesting the change in classification to HTS 3824.90.9295, requesting further review as well as subsequent re-liquidation under HTS 3822.00.5090,

**Facts**

On March 4, 2016, Customs and Border Protection, Port 4002, hereafter CBP, issued a CBP Form 28, request for information, on entry 101-4724659-9. Siemens Healthcare Diagnostics, hereafter DX, was requested to provide product details for the item identified as "Immulite Olive 40T"".  At the time of import the product was classified under HTS 3002.10.0290: Human blood; animal blood prepared for therapeutic, prophylactic or diagnostic uses; antisera and other blood fractions and modified immunological products, whether or not modified or obtained by means of biotechnological processes; vaccines, toxins, cultures of micro-organisms (excluding yeasts) and similar products.

In the response to the CBP Form 28 dated March 25, 2016, DX responded and contended that the essential character of Immulite 2000 Olive is an in vitro diagnostic test component and appropriately classified, based on GRI 1, under HTS 3822.00.5090.  "Immulite Olive 40T" is a protein-biotin complex used as part of an immunological based in vitro diagnostic test; itself is not an immunological item nor sera or antisera therefore disqualified from 3002.

In June 2016 CBP requested further clarification of DX's response to the CBP Form 28; specifically requesting the composition of the part in question.  DX complied with that request on June 6, 2016.  The composition was provided as the allergen item along with other ingredients such as stabilizers, biocide, buffers and diluent.

On November 7, 2016 CBP issued a CBP Form 29, declaring an action had been taken to reclassify the subject merchandise under HTS 3824.90.9295 and the entry was liquidated on this date.  The issued CBP Form 29 stated that the product does not engage in a chemical reaction nor produces an observable change in the analyte being measured and therefore disqualified from 3822.

A request by DX to discuss the action was made and a subsequent phone call took place with Import Specialist Russell Hack and Supervisor Import Specialist Vivian Collins. Our response to the initial CBP 28 was reviewed and DX provided information to demonstrate that the item in question does undergo a chemical reaction as part of the in vitro diagnostic test; and in fact "Immulite Olive 40T" is the key component of the reaction, without which the immunological based in vitro diagnostic test would not work. We were advised to file a protest.   Entry 101-4724659-9 was liquidated on 11-25-2016 with line item 21 (the Immulite 2000 Olive 40T) classified under HTS 3824.90.9295

The imported product " Immulite Olive 40T" is an allergen-ligand (Biotin-Olive Protein) compound with other ingredients, and is used in conjunction with an in vitro diagnostic test kit (Immulite 2000 3gAllergy Specific IgE)  to measure the allergen-specific IgE in human serum to aid in the diagnosis of IgE mediated allergic disorders.  This test is a solid-phase, two-step chemiluminescent immunoassay.  The overall test cannot be run without an allergen-ligand panel which provides the specificity for the IgE being present. The 3g Allergy Specific IgE in vitro diagnostic test is used to determine the presence of IgE antibodies in a human specimen in response to an allergic reaction. The test obtains its functionality to bind to a specific allergen IgE in the human specimen directly by an allergen-ligand compound (in this case the "Immulite Olive 40T" reagent) which directly reacts with the IgE in the human serum.

 The Olive portion of the Olive-Biotin compound (Immulite Olive 40T) attaches to the human IgE in the serum to form IgE-Olive Allergen Protein – Biotin.  In order to separate this Human IgE - Olive Allergen Protein - Biotin compound from the sample matrix a solid phase bead is also incubated with specimen

under test.  The solid bead is coated with anti-ligand (anti-biotin).  This attaches to the Biotin side of the Biotin-Olive-Human IgE compound to form BEAD-AntiBiotin-Biotin-Olive-Human IgE. The IgE from the serum specimen is now bound to the solid bead directly as a result of the reaction with the allergy-ligand compound, in this case the "Immulite Olive 40T".  Unbound sample is washed from the sample chamber in the instrument.

In the second cycle, enzyme conjugated anti-human IgE is added to the sample chamber and attaches to the Human IgE.  A chemiluminescent reagent is added and the signal generated is proportional to the bound enzyme.  This allows for quantitation of the level if IgE in the human specimen under test due to Olive allergen present in the human serum.

**Issue-**

At issue is if the classification of "Immulite Olive 40T" is appropriately under 3824.90. HTSUS, which provides for Chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included: Other: Other: Other: Other: Other; or classifiable under 3822.00.5090 HTSUS which provides for composite diagnostic or laboratory reagents, other than those of heading 3002 or 3006: other: other.

Classification of goods under the HTSUS is governed by the General Rules of Interpretation (GRI). GRI 1 provides that classification shall be determined according to the terms of the headings of the tariff schedule and any relative section or chapter notes. In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRI may then be applied.

Possible assignments are:
3002 Provides  Human blood; animal blood prepared for therapeutic, prophylactic or diagnostic uses; antisera and other blood fractions and modified immunological products, whether or not modified or obtained by means of biotechnological processes; vaccines, toxins, cultures of micro-organisms (excluding yeasts) and similar products: Further EN 30.02 (E) Diagnostic Test kits directs that diagnostic test kits are classified here when th essential character of the kit is given by the products of this heading.

3006 Provides for Pharmaceutical goods specified in Note 4 to chapter 30.  Note 4 includes surgical items, sterile medical equipment, blood-grouping reagents, dental items, first-aid kits, contraceptive preparations, gel preparations designed to be used in human or veterinary medicine as a lubricant, waste pharmaceuticals and appliances identified for ostomy use.

3822 Provides for Diagnostic or laboratory reagents on a backing and prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006; certified reference materials.  Diagnostic reagents are used in the evaluation of physical, biophysical, or biochemical processes and states in animals and humans; their function is based on a measurable or observable change in the biological or chemical substances constituting the reagent. Prepared diagnostic reagents of this heading may be similar in function to those designed to be administered to-patients-(subheading 3006.30), with the exception that they are used for in vitro, rather than for in vivo, applications. Prepared laboratory- reagents include not only diagnostic reagents, but also other analytical reagents used for purposes other than detection or diagnosis.

3824 Provides for binders for foundry moulds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included.

As stated above, the "Immulite Olive 40T" is a key component of an in vitro diagnostic test, and provides for the specificity of the diagnostic test for the analyte. The item "Immulite Olive 40T" is not comprised of Human blood; animal blood prepared for therapeutic, prophylactic or diagnostic uses; antisera and other blood fractions and modified immunological products therefore it is excluded from 3002.

As the associated diagnostic test is in vitro, not in vivo, the "Immulite Olive 40T" it is excluded from 3006.

Classification of " Immulite Olive 40T" under HTS 3824.90.9595 is not consistent with other legally binding rulings made previously by Customs.  For instance ruling NY810394 determined that an in-vivo allergen patch test was classified under HTS 3006.30.1000 as an in vivo diagnostic test.  The product under ruling NY810394 was a series of allergen materials that were intended to be attached with surgical tape directly to a patient to determine if the patient would have an adverse reaction to the allergen materials.  The subject product of that ruling did not undergo any chemical change nor did the test produce any observable change in the allergen materials but rather the patient would potentially react to the allergen material.  We would argue that our test is similar in nature in that the "Immulite Olive 40T "undergoes processing with a patient sample to identify a specific allergy condition but our test is in vitro rather than in vivo and therefore under HTS 3822.00.5090 rather than HTS heading 3006.

In HQ H129336, CBP Headquarters define a reagent as "a substance employed as a test to determine the presence of some other substance by means of the reaction which is produced…" and further states "typically, a reagent is mixed with another chemical, reacts with it, and is consumed in that reaction, creating a different set of chemicals". The item under discussion in this ruling "M-450 TOS is used in Cell Isolation procedures. M-280 TOS is used in Protein Purification and Immunoassay procedures. All of these procedures use a ligand (such as an antibody, protein, peptide, or glycoprotein) to isolate and separate a target molecule. However, the instant merchandise, as imported, cannot be used for either procedure. The end user must employ the Ligand Coupling Protocol as outlined in the product manuals.This process is a chemical reaction which removes the sulfonyl ester groups from the polyurethane layer and replaces them with the ligand chosen by the end user. Once this procedure is complete, the user has a new chemical substance which can be used for some other purpose, be it Cell Isolation, Protein Purification or Immunoassays."  The holding of this ruling is that by application of GRI 1, the Dynabeads M-450 and Dynabeads M-280 Tosylactivated products are properly classified under heading 3822, HTSUS, specifically under subheading 3822.00.50, HTSUS

The reaction which the subject material undergoes in HQ H129336 is similar to the first steps of the 3gAllergy IgE specific diagnostic test in that a ligand compound (in our case the Olive allergen – biotin compound) binds to IgE from a patient sample, creating a different material, and then that material is bound to an anti-biotin bead.

**Conclusion**

The "Immulite Olive 40T" contains the allergen-ligand compound and used, in conjunction with the Immulite 3gAllergy Specific IgE Universal kit (produced and sold separately from the allergen panel), to perform an in vitro diagnostic test to quantitatively measure IgE present in human serum which is an allergy response to Olive tree pollen; it directly reacts as part of the in vitro test and in fact is the component which makes the test specific for the IgE associated with the allergen.

Therefore we contend that the essential character of "Immulite Olive 40T" is defined as an in vitro diagnostic test reagent and appropriately classified, based on GRI 1, under HTS 3822.00.5090.

Exhibit E


U.S. Customs and
Border Protection

HQ H286756

NOV 1 3 2018

**OT:RR:CTF:CPMM** H286756 RGR

**CATEGORY:** Classification

**TARIFF NO.:** 3824.90.9295

Port Director, Service Port of Cleveland
U.S. Customs and Border Protection
6747 Engle Road
Middleburg Heights, OH 44130

**RE:**   Application for Further Review of Protest No. 4110-17-100015; Tariff
classification of Immulite 2000 Olive 40T

Dear Port Director:

The following is our decision regarding the Application for Further Review
("AFR") of Protest Number 4110-17-100015, timely filed on January 13, 2017, on behalf
of Siemens Healthcare Diagnostics ("Protestant").  The AFR concerns U.S. Customs
and Border Protection's ("CBP") classification, under the Harmonized Tariff Schedule of
the United States ("HTSUS"), of "Immulite 2000 Olive 40T."

**FACTS:**

The protested merchandise consists of a product identified as "Immulite 2000
Olive 40T," which is an allergen protein extract derived from olive tree pollen.
Specifically, the imported merchandise consists of a mixture of potassium chloride,
bovine serum albumin, potassium phosphate dibasic anhydrous, potassium phosphate
monobasic anhydrous, 2-methyl-3(2H)-isothiazolone and distilled water.

CBP Laboratory and Scientific Services ("LSSD") issued report number
NY20160561 on August 29, 2016.  It states, in pertinent part, the following:

The product is a mixture of antigens, derived from olive trees, chemically
bound to molecules of biotin.  During performance of the test, the antigen
portion binds to specific antibodies contained in the patient's blood.
Further purification and treatment of the antibody-antigen complex is

required to measure allergenicity; these materials are not imported with the instant product.  The instant product itself engages in no chemical reaction and produces no observable change in the analyte being measured.

The instant protein extract is used with the Immulite 2000 series of analyzers.  Specifically, it is used with a separately imported *in vitro* diagnostic test kit called Immulite Olive 2000 3gAllergy Specific IgE for the quantitative measurement of allergen-specific IgE in human serum to aid in the diagnosis of IgE-mediated allergic disorders.  According to a manual submitted by the Protestant titled "IMMULITE 2000 3gAllergy Specific IgE Universal Kit:  Panel Allergen Application," the principle of the test procedure involves a solid-phase, two-step chemiluminescent immunoassay that exploits liquid phase kinetics in a bead format.[1]  Neither the liquid phase nor solid bead phase are provided in the instant merchandise.

The subject merchandise was originally entered on January 22, 2016, under subheading 3002.10.0290, HTSUSA (Annotated) (2016), which provides for "Antisera, other blood fractions and immunological products, whether or not obtained by means of biotechnological processes:  Other," and liquidated on November 25, 2016, by the Port of Cleveland under subheading 3824.90.9295, HTSUSA (2016), which provides for "Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included:  Other:  Other:  Other:  Other:  Other:  Other," at a duty rate of 5% *ad valorem*.[2]

Protestant filed this Protest and AFR on January 13, 2017, asserting that the Immulite 2000 Olive 40T allergen protein extract is properly classified under subheading 3822.00.5090, HTSUSA, which provides for "Diagnostic or laboratory reagents on a backing, other than those of heading 3002 or 3006:  Other:  Other."

In its March 17, 2016 letter, in response to a request for information on the entry, Protestant states:

> The allergen panels are manufactured at Siemens Healthcare Diagnostics' facility located in Los Angeles, California, then exported to the Siemens Healthcare Diagnostics' facility in Llanberis, Great Britain where the allergen panels are packaged for sale.  In the case of this entry, the material was shipped from Siemens Healthcare Diagnostics' facility in Marburg, Germany to replenish U.S. inventory.

---

[1] *See* "Siemens Immulite 2000 3gAllergy Specific IgE Universal Kit:  Panel Allergen Application (PIL2KUNPD-2, 2014-01-21)."

[2] In 2017, this tariff provision was moved to subheading 3824.99.9297, HTSUSA.

**ISSUE:**

Whether Immulite 2000 Olive 40T allergen protein extract is classified under heading 3822, HTSUS, as "Diagnostic or laboratory reagents on a backing, other than those of heading 3002 or 3006," or under heading 3824, HTSUS, as "Chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included."

**LAW AND ANALYSIS:**

The protest was properly filed as a decision on classification under 19 U.S.C. § 1514(a)(2). The protest was timely filed within 180 days of liquidation of the entries. *See* 19 U.S.C. § 1514(c)(3).

Further Review of Protest Number 4110-17-100015 was properly accorded to Protestant pursuant to 19 C.F.R. § 174.24(a) on the grounds that the decision against which the protest was filed is alleged to be inconsistent with previous rulings issued by CBP with respect to substantially similar merchandise.

Classification under the HTSUS is made in accordance with the General Rules of Interpretation ("GRI"). GRI 1 provides that the classification of goods shall be determined according to the terms of the headings of the tariff schedule and any relative section or chapter notes. In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRIs may then be applied.

The HTSUS provisions under consideration are as follows:

3822    Diagnostic or laboratory reagents on a backing and prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006; certified reference materials:

3824    Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included:

\*       \*       \*

The Harmonized Commodity Description and Coding System Explanatory Notes (EN) constitute the official interpretation of the Harmonized System at the international level. While neither legally binding nor dispositive, the ENs provide a commentary on the scope of each heading of the HTSUS and are generally indicative of the proper interpretation of the headings. It is CBP's practice to consult, whenever possible, the terms of the ENs when interpreting the HTSUS. *See* T.D. 89–80, 54 Fed. Reg. 35127, 35128 (Aug. 23, 1989).

The EN to 38.22 states, in relevant part:

This heading covers **diagnostic or laboratory reagents on a backing, prepared diagnostic** or **laboratory reagents, other than** diagnostic reagents of **heading 30.02** or diagnostic reagents designed to be administered to the patient and blood grouping reagents of **heading 30.06**. It also covers **certified reference materials**. Diagnostic reagents are used in the evaluation of physical, biophysical or biochemical processes and states in animals and humans; their function is based upon a measurable or observable change in the biological or chemical substances constituting the reagent. Prepared diagnostic reagents of this heading may be similar in function to those designed to be administered to patients (subheading 3006.30), with the exception that they are used for *in vitro*, rather than for *in vivo*, applications. Prepared laboratory reagents include not only diagnostic reagents, but also other analytical reagents used for purposes other than detection or diagnosis. Prepared diagnostic and laboratory reagents may be used in medical, veterinary, scientific or industrial laboratories, in hospitals, in industry, in the field or, in some cases, in the home.

Reagents of this heading are either on a backing or in the form of preparations and thus comprise more than a single constituent. For example, they may consist of admixtures of two or more reagents or of single reagents dissolved in solvents other than water. They may also be in the form of paper, plastics or other materials (used as backings or support), impregnated or coated with one or more diagnostic or laboratory reagents, such as litmus, pH or pole-finding papers or pre-coated immuno-assay plates. Reagents of this heading may also be put up in the form of kits, consisting of several components, even if one or more components are separate chemically defined compounds of Chapter 28 or Chapter 29, synthetic colouring matter of heading 32.04 or any other substance which, when presented separately, would be classifiable under another heading. Examples of such kits are those for testing glucose in blood, ketones in urine, etc., and those based on enzymes. However, diagnostic kits having the essential character of products of **heading 30.02** or **30.06** (e.g., those based on monoclonal or polyclonal antibodies) are **excluded**.

The reagents of this heading should be clearly identifiable as being for use only as diagnostic or laboratory reagents. This must be clear from their composition, labelling, instructions for *in vitro* or laboratory use, indication of the specific diagnostic test to be performed or physical form (e.g., presented on a backing or support).

\*       \*       \*

The subject merchandise can only be classified in heading 3824, HTSUS, if it is deemed excluded from heading 3822, HTSUS. *Cargill, Inc. v. United States*, 318 F. Supp. 2d 1279, 1278-88 (Ct. Int'l. Trade 2004) (characterizing heading 3824, HTSUS, as a basket provision). Accordingly, we initially consider whether the instant merchandise, a protein extract in a solution without other components of a diagnostic kit, is classifiable in heading 3822, HTSUS.

The tariff term "reagent" is not defined in the HTSUS, but in Headquarters Ruling Letter ("HQ") H129336, dated July 11, 2011, CBP stated:

A reagent is "a substance employed as a test to determine the presence of some other substance by means of the reaction which is produced. Now, any substance employed in chemical reactions." *The Compact Oxford English Dictionary*, Second Edition (p. 271, 1991).

* * *

> Typically, a reagent is mixed with another chemical, reacts with it, and is consumed in
> that reaction, creating a different set of chemicals.  For instance, silver nitrate is a reagent
> used for the detection of certain halide ions (chloride, iodide, bromide), particularly for
> chloride.  When clear silver nitrate and sodium chloride solutions are combined, the silver
> and chloride ions react with one another to form a silver chloride solid precipitate and a
> solution of sodium nitrate.  Hence, the addition of silver nitrate to a clear sodium chloride
> solution allows one to detect the presence of chloride in the solution, because the white
> silver chloride precipitate could not have formed without its presence.

Similarly, in HQ H259355, dated December 19, 2017, CBP also relied on dictionary
definitions in determining the meaning of "reagent" for purposes of heading 3822,
HTSUS:  "Hawley's Condensed Chemical Dictionary defines a reagent, in part, as 'Any
substance used in a reaction for the purpose of detecting, measuring, examining, or
analyzing other substances.'"  Therefore, in order for the subject merchandise to be a
reagent within the meaning of heading 3822, HTSUS, it must participate in a chemical
reaction when used to detect other substances as part of diagnostic testing.

In Laboratory Report Number NY20160561, LSSD determined that "The instant
product engages in no chemical reaction and produces no observable change in the
analyte being measured (emphasis added)."  Thus, by itself, the subject merchandise
does not participate in any reaction or measureable change and therefore is not
classified as a reagent of heading 3822, HTSUS, when imported separately.

In fact, CBP has consistently classified certain solutions imported separately,
even if intended for inclusion in a reagent kit, outside of heading 3822, HTSUS, when
they do not participate in a chemical reaction when used in conjunction with other
articles in the kit and a sample of the patient's blood.  For example, in NY N258021,
dated December 22, 2014, CBP excluded from heading 3822, HTSUS, a product called
R1, consisting of N, N-bis (2-hydroxyethyl) glycine (Bicine) buffer, colipase (porcine
pancreas), a detergent and a preservative.  This product was imported separately in
bulk form to make up an enzymatic in vitro diagnostic test kit.  In its condition as
imported, R1 is merely used to increase the specificity of the test procedure, and it is
not used by itself for the detection of pancreatic lipase and does not undergo an
observable or measurable change.  However, in that same ruling, CBP classified in
heading 3822, HTSUS, another product called R3, consisting of Tartrate buffer, 1,2-O-
dilauryl-rac-glycero-3-glutaric acid-(6-methylresofurin) ester (chromogenic lipase
substrate), taurodeoxycholate, a detergent and a preservative.  Like R1, R3 was
imported separately in bulk form to make up an enzymatic in vitro diagnostic test kit.
However, unlike R1, R3 participates in a chemical reaction when it reacts with lipase to
form a red dye, which is proportional to lipase activity and can be determined
photometrically.  Moreover, R3 acts as a reagent of heading 3822, HTSUS, as it
contains a chromogenic compound which when added to the sample, produces a
measurable color change.

In NY N256882, dated February 5, 2015, CBP also excluded from classification
in heading 3822, HTSUS, a product called Iron-SL Dissociating Reagent (R1),
consisting of an acid buffer solution containing a surfactant, preservatives and

stabilizers.  This product was imported separately in bulk form to make up an *in vitro* diagnostic test kit for the determination of iron in human serum.  In the condition as imported, R1 was merely used to prepare a serum sample for quantification by reagent R2 and was not used for the detection of iron in human serum and did not undergo an observable or measurable change.  On the other hand, a second product called Iron-SL Color Reagent (R2), and consisting of a solution containing ferene and stabilizers, was classified in heading 3822, HTSUS, because the ferene participated in a chemical reaction with ferrous iron to form a blue chromophore.  Further, R2 undergoes processes to form a ferrous-ferene complex, which is observable visually and quantifiable.

Similar to the products identified as R1 in NY N258021 and NY N256882, the instant merchandise is also added to an *in vitro* immunoassay kit after importation, but does not participate in a chemical reaction and does not produce an observable or measurable change when used in conjunction with the kit.  Therefore, in its condition as imported, the subject merchandise is not classified in heading 3822, HTSUS.

The Protestant relies on NY 810394, dated June 5, 1995, in support of its argument that the subject merchandise should be classified in heading 3822, HTSUS.  In NY 810394, CBP classified an allergen patch test consisting of a thin-layer, rapid-use epicutaneous test system as a diagnostic reagent under subheading 3006.30.10, HTSUS, which provides for "diagnostic reagents designed to be administered to the patient: containing antigens or antisera."  Heading 3006 is not at issue here as Protestant does not state the instant merchandise is designed to be administered to the patient.  That case is not dispositive here.

The Protestant also relies on HQ H129336, dated July 11, 2011, in support of its argument that the subject allergen protein extract should be classified in heading 3822, HTSUS.  There, CBP classified "Dynabeads M-450 Tosylactivated" and "Dynabeads M-280 Tosylactivated" products under heading 3822, HTSUS.  The Dynabeads are polysterene spheres that act as a solid phase for the attachment of antibodies.  The Protestant argues that the reaction of the Dynabeads in HQ H129336 is similar to the first steps of the Immulite 2000 3gAllergy IgE specific diagnostic test in that a ligand compound binds to IgE from a patient sample, creating a different material, which is bound to an anti-biotin bead.  However, the Dynabeads participate in a chemical reaction by providing "reactive sulphonyl esters that can react covalently with proteins (e.g. antibodies) or other ligands containing primary amino or sulphydryl groups.  No further activation is necessary.  Dynabeads M450 Tosylactivated will bind proteins physically and chemically with an increasing number of covalent bonds with higher temperature and pH."  Accordingly, CBP classified the Dynabeads as laboratory reagents of heading 3822, HTSUS.  In contrast, the subject allergen protein extract, by itself, does not participate in a chemical reaction, nor does it produce an observable or measurable change when mixed with an antibody.  Therefore, the subject Immulite 2000 Olive 40T allergen protein extract is not classifiable in heading 3822, HTSUS.

As Immulite 2000 Olive 40T allergen protein extract is not elsewhere specified or included, it is classified in heading 3824, HTSUS, specifically under subheading 3824.90.9295, HTSUSA (2016), which provides for: "Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included: Other: Other: Other: Other: Other: Other."

**HOLDING:**

By application of GRIs 1 and 6, the subject Immulite 2000 Olive 40T allergen protein extract is classified under heading 3824, HTSUS, specifically under subheading 3824.90.9295, HTSUSA (2016), which provides for "Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included: Other: Other: Other: Other: Other: Other." The column one, general rate of duty at the time of entry was 5% *ad valorem*.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided at https://hts.usitc.gov/current.

You are instructed to DENY the protest.

In accordance with Sections IV and VI of the CBP Protest/Petition Processing Handbook (HB 3500-08A, December 2007, pp. 24 and 26), you are to mail this decision, together with the CBP Form 19, to the Protestant no later than 60 days from the date of this letter. Any reliquidation of the entry or entries in accordance with the decision must be accomplished prior to mailing the decision.

Sixty days from the date of the decision, the Office of Trade, Regulations and Rulings will make the decision available to CBP personnel and to the public online at http://www.cbp.gov, by means of the Freedom of Information Act, and other methods of public distribution.

Sincerely,

Myles B. Harmon, Director
Commercial and Trade Facilitation Division

Exhibit F

**DEPARTMENT OF HOMELAND SECURITY**
U.S. CUSTOMS AND BORDER PROTECTION
LABORATORIES AND SCIENTIFIC SERVICES

New York Laboratory, 1100 Raymond Blvd., Newark, NJ 07102

973-368-1900; 973-368-1905 (Fax)

# LABORATORY REPORT

| | | | |
|---|---|---|---|
| **Lab Report #:** | NY20160561 | **ID #:** | QUICS 32509 |
| **Submitted by:** | ███████ | | |
| **Received:** | 04/26/2016 | **Reported:** | 08/29/2016 |
| **Sample Description:** | Immulite Olive kit | | |
| **Sample Components:** | Immulite Olive kit | | |

**Information Requested:** Does it meet definition of reagent in 3822? Is there a chemcal reaction and is the reagent consumed?

**Narrative:**

```
Product name: Immulite 2000 Olive
Use:         Component of allergy testing reagent

The product is a mixture of antigens, derived from olive trees, chemically
bound to molecules of biotin.  During performance of the test, the antigen
portion binds to specific antibodies contained in the patient"s blood.
Further purification and treatment of the antibody-antigen complex is required
to measure allergenicity; these materials are not imported with the instant
product.  The instant product itself engages in no chemical reaction and
produces no observable change in the analyte being measured.
```

**Analyst**

███████████

**Approved By**

███████████
███████████

This U.S. Customs and Border Protection laboratory report and any attached files or information are provided "For Official Use Only".   Results contained in this laboratory report relate only to the items tested.   The Laboratory report may contain information that may be exempt from public release, under the Freedom of Information Act (5 U.S.C. 552) (FOIA) and/or the Privacy Act (5 U.S.C. 552a), or may be "Law Enforcement Sensitive".   The information provided should not be employed for any other use that is not consistent with a use for which it has been provided and shall not be reproduced, except in full.   All FOIA or any other requests for information pertaining to this laboratory report must be directed to the originator, U.S. Customs and Border Protection, Office of Information and Technology, Laboratories and Scientific Services for review and subsequent release.

CBP Form 6415B (10/08)

Exhibit G

HQ H129336

July 11, 2011

**CLA–2 OT:RR:CTF:TCM** H129336 AMM

**CATEGORY:** Classification

**TARIFF NO.:** 3822.00.50

Mr. Gregory Blyskal
Dynal, Inc.
475 Northern Blvd.
Great Neck, NY 11021

RE:  Modification of New York Ruling Letter 860953; Tariff Classification of
     Diasorin Dynabeads M-450 Tosylactivated and Dynabeads M-280
     Tosylactivated products

Dear Mr. Blyskal,

       This is in regard to New York Ruling Letter (NY) 860953, issued to Dynal,
Inc. (Dynal), dated March 38, 1991, regarding the classification under the
Harmonized Tariff Schedule of the United States (HTSUS), of Dynabeads M-450
Tosylactivated (M-450 TOS) and Dynabeads M-280 Tosylactivated (M-280 TOS)
products.  Customs and Border Protection (CBP) classified the above-identified
products under heading 3903, HTSUS, which provides for "Polymers of styrene,
in primary forms".  We have reviewed NY 860953 and found it to be incorrect.
For the reasons set forth below, we propose to modify that ruling.

       Pursuant to section 625(c)(1), Tariff Act of 1930 (19 U.S.C. §1625(c)(1)),
as amended by section 623 of Title VI, notice proposing to revoke NY 860953
was published on May 25, 2011, in Volume 45, Number 22, of the Customs
Bulletin.  CBP received no comments in response to this notice.

**FACTS:**

       In NY 860953, CBP described the products in the following manner:

       The beads (both the M-450 and M-280) are polystyrene spheres that contain
       an iron oxide salt. The polystyrene bead acts as a solid phase for the
       attachment of antibodies. There are two groups of products as follows:

       Group I types are uncoated beads which allow researchers to attach an
       antibody of their choice directly onto the bead:  Dynabeads M-450 uncoated
       Dynabeads M-450 Tosylactivated Dynabeads M-280 Tosylactivated

*           *           *

In NY 860953, CBP classified M-280 TOS and M-450 TOS in heading 3903, HTSUS, specifically under subheading 3903.19.00, HTSUS, which provides for "Polymers of styrene, in primary forms: Polystyrene: Other".

According to the product manual provided at <http://tools.invitrogen.com/ content/sfs/manuals/140 13.Dynabeads M-450 Tocylactivated(rev002).pdf>, the M-450 TOS product is described in the following manner:

> 1.1 Intended Use
> Dynabeads M-450 Tosylactivated coupled with antibodies or other ligands provide a versatile tool for isolation of both cells and non-cell targets (e.g. proteins and other biomolecules). Their size makes them particularly suitable for stimulation and expansion of e.g. T cells (2,3,4,7). Cells can be directly isolated from any sample such as whole blood, bone marrow, mononuclear cell suspensions (MNC) or tissue digests.
> *           *           *
> 1.2 Principle of Coupling
> Dynabeads M-450 Tosylactivated provide reactive sulphonyl esters that can react covalently with proteins (e.g. antibodies) or other ligands containing primary amino or sulphydryl groups. No further activation is necessary. Dynabeads M-450 Tosylactivated will bind proteins physically and chemically with an increasing number of covalent bonds with higher temperature and pH.
> *           *           *
> 1.4 Description of Materials
> Dynabeads M-450 Tosylactivated are uniform, superparamagnetic polystyrene beads (4.5 μm diameter) with a surface suitable for physical and chemical binding of antibodies and other biomolecules.
> *           *           *
> 4. GENERAL INFORMATION
> *           *           *
> Warning And Limitations
> This product is for research use only. Not intended for any animal or human therapeutic or diagnostic use unless otherwise stated.
> *           *           *

According to the product manual provided at <http://tools.invitrogen.com/ content/sfs/manuals/142.03.04rev009.pdf>, the M-280 TOS product has a similar construction, except that the beads are smaller (2.8 μm diameter instead of 4.5 μm).  In addition, the M-280 TOS product is recommended for Target Protein Isolation procedures and Immunoassy procedures, rather than Cell Isolation.

**ISSUE:**

What is the proper classification of the Dynabeads M-280 Tosylactivated and Dynabeads M-450 Tosylactivated products under the HTSUS?

2

**LAW AND ANALYSIS:**

Classification of goods under the HTSUS is governed by the General Rules of Interpretation (GRI).  GRI 1 provides that classification shall be determined according to the terms of the headings of the tariff schedule and any relative section or chapter notes.  In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRI may then be applied.

The 2011 HTSUS provisions at issue are as follows:

```
3822          Diagnostic or laboratory reagents on a backing and prepared diagnostic or
              laboratory reagents, whether or not on a backing, other than those of heading
              3002 or 3006; certified reference materials:
                     Diagnostic or laboratory reagents on a backing, prepared diagnostic or
                     laboratory reagents, whether or not on a backing, other than those of
                     heading 3002 or 3006:
3822.00.50                   Other
------------------------------------------------------------------
3903          Polymers of styrene, in primary forms:
                     Polystyrene
3903.19.00                   Other
------------------------------------------------------------------
```

Note 2(k) to Chapter 39, HTSUS, states, in pertinent part:  "This chapter does not cover: … (k) Diagnostic or laboratory reagents on a backing of plastics (heading 3822); …".

The Harmonized Commodity Description and Coding System Explanatory Notes (ENs), constitute the official interpretation of the Harmonized System at the international level.  While neither legally binding nor dispositive, the EN provide a commentary on the scope of each heading of the HTSUS and are generally indicative of the proper interpretation of the headings.  It is CBP's practice to consult, whenever possible, the terms of the ENs when interpreting the HTSUS.  <u>See</u> T.D. 89–80, 54 Fed. Reg. 35127, 35128 (August 23, 1989).

The EN to Heading 38.22 states, in pertinent part:

> Prepared laboratory reagents include not only diagnostic reagents, but also other analytical reagents used for purposes other than detection or diagnosis.  Prepared diagnostic and laboratory reagents may be used in medical, veterinary, scientific or industrial laboratories, in hospitals, in industry, in the field or, in some cases, in the home.
>
>       *          *          *

The instant merchandise, as imported, consists of three layers.  The first two layers are a manufactured "bead," which has a core of iron oxide salt encapsulated by a polystyrene polymer.  The beads are manufactured in a special process, giving them two important characteristics.  First, all the beads are the same size.  This is a function of the emulsification process of the

polystyrene polymerizing process.  Second, the beads are magnetic.  This is a function of the added iron oxide salt.  These beads functions as the "backing."  The beads are then coated with a third layer, which is a polyurethane polymer.  Finally, the hydroxyl groups of the polyurethane polymer are reacted with p-toluenesulfonyl chloride, which attaches sulfonyl ester groups to the hydroxyl groups of the polyurethane.

M-450 TOS is used in Cell Isolation procedures.  M-280 TOS is used in Protein Purification and Immunoassay procedures.  All of these procedures use a ligand (such as an antibody, protein, peptide, or glycoprotein) to isolate and separate a target molecule.  However, the instant merchandise, as imported, cannot be used for either procedure.  The end user must employ the Ligand Coupling Protocol as outlined in the product manuals.[1]  This process is a chemical reaction which removes the sulfonyl ester groups from the polyurethane layer and replaces them with the ligand chosen by the end user.  Once this procedure is complete, the user has a new chemical substance which can be used for some other purpose, be it Cell Isolation, Protein Purification or Immunoassays.

A reagent is "a substance employed as a test to determine the presence of some other substance by means of the *reaction* which is produced.  Now, any substance employed in chemical reactions."  The Compact Oxford English Dictionary, Second Edition (p. 271, 1991).  Such substances are also called reactants.  A reactant is defined as "a substance that is consumed in the course of a chemical reaction.  It is sometimes known, especially in the older literature, as a reagent, but this term is better used in a more specialized sense as a test substance that is added to a system in order to bring about a reaction or to see whether a reaction occurs (e.g. an analytical reagent)."  Compendium of Chemical Terminology, IUPAC Recommendations, Second Edition. (p. 342, 1997).

Typically, a reagent is mixed with another chemical, reacts with it, and is consumed in that reaction, creating a different set of chemicals.  For instance, silver nitrate is a reagent used for the detection of certain halide ions (chloride, iodide, bromide), particularly for chloride.  When clear silver nitrate and sodium chloride solutions are combined, the silver and chloride ions react with one another to form a silver chloride solid precipitate and a solution of sodium nitrate.  Hence, the addition of silver nitrate to a clear sodium chloride solution allows one to detect the presence of chloride in the solution, because the white silver chloride precipitate could not have formed without its presence.

---

[1]   See <http://tools.invitrogen.com/content/sfs/manuals/140 13.Dynabeads M-450 Tocylactivated(rev002).pdf>, Section 2.2;<http://tools.invitrogen.com/content/sfs/manuals/142.03.04rev009.pdf>, Section 2.2.

The instant merchandise meets the definition of "reagent."  Both are mixed with another chemical, specifically, the chosen ligand and buffer solutions.  A chemical reaction occurs, wherein the sulfonyl ester groups attached to the polyurethane polymer are removed and replaced with the chosen ligand.  The chemical composition of the polyurethane layer is changed.  The reaction creates a different set of chemicals, usable for a new purpose.  Therefore, the M-450 TOS and M-280 TOS products are properly classified under heading 3822, HTSUS, as "… prepared … laboratory reagents, whether or not on a backing …".

New York Ruling (NY) 863359, dated May 24, 1991, considered four similar products, namely Dynabeads M-280 streptavidin, Dynabeads Oligo (dt)25, Dynabeads Template preparation kit and Dynabeads mRNA.  All of these products use the same superparamagnetized polystyrene bead as the instant merchandise.  However, they use a different coating.  The Dynabeads M-280 streptavidin product is a bead coated with streptavidin, which is a protein used to capture biotin from a sample.  This product is ready to use for numerous applications, including purification of proteins and nucleic acids, protein interaction studies, immunoprecipitation, immunoassays, phage display, biopanning, drug screening and cell isolation.  The Dynabeads Oligo (dt) 25 product is a bead coated with oligonucleotides, which is a nucleic acid used to capture intact mRNA from a sample.  The product is ready to use for the rapid isolation of highly purified, intact mRNA from eukaryotic total RNA or directly from crude extracts of cells, animal and plant tissues.  The Dynabeads Template preparation kit is a package containing Dynabeads M-280 streptavidin and several buffer solutions.  The Dynabeads mRNA purification kit is a package containing Dynabeads Oligo (dt)25 and several buffer solutions.  These products are different from the instant merchandise, in that they do not have to go through the Coating Procedure.  A chosen ligand has already been attached.  However, they are similar in that the products coated with streptavidin and oligonucleotide form strong chemical bonds with their target molecule, changing their chemical composition.  CBP classified them under heading 3822, HTSUS, as reagents, even though the reactions are reversible.

In Headquarters Ruling (HQ) 967094, dated May 11, 2006, CBP considered HyperD® products similar to the instant merchandise.  The HyperD® products are composite materials in bead form consisting of a co-polymeric crosslinked network (hydrogel) distributed inside the pores of a rigid, mineral (mixture of sintered zirconium and calcium silicates) "ceramic" support (substrate). The substrate acts as a solid skeleton, while the hydrogel polymer governs the exchange mechanism for macromolecule or particle adsorption. The polymer provides a tridimensional network for the capture of separated molecules.  Affinity ligands are chemically attached to the hydrogel polymers at one end, leaving the other end free to react with the targeted substance to form a complex or coordination compound with that substance.  CBP held that these products were "separation media," rather than reactants, and found that they were not classifiable under heading 3822, HTSUS.

Separation media are not reagents because there is no chemical reaction that consumes the reagent.  Rather, the HyperD® products are used in "adsorption chromatography," the "separation of a chemical mixture (gas or liquid) by passing it over an adsorbent bed which adsorbs different compounds at different rates."  "Adsorption" is defined as "the surface retention of solid, liquid, or gas molecules, atoms, or ions by a solid or liquid . . . ." McGraw-Hill Dictionary of Scientific and Technical Terms, Fifth Ed., Parker, Sybil P., ed. (1994, p. 38). While the EN's specifically include a seemingly broad spectrum of reagents, including "other analytical reagents used for purposes other than detection or diagnosis," separation media cannot be considered a reagent, analytical or otherwise, as explained above.

Chapter 39, HTSUS, does not cover laboratory reagents on a backing of plastics.  See Note 2(k) to Chapter 39, HTSUS.  As described above, the instant merchandise is a prepared laboratory reagent.  In addition, it is on a backing of plastics, in the form of a polystyrene and polyurethane superparamagnetic bead. Therefore, the M-450 TOS and M-280 TOS products are precluded from classification under heading 3903, HTSUS.

**HOLDING:**

By application of GRI 1, the Dynabeads M-450 and Dynabeads M-280 Tosylactivated products are properly classified under heading 3822, HTSUS, specifically under subheading 3822.00.50, HTSUS, which provides for "Diagnostic or laboratory reagents on a backing and prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006; certified reference materials: Diagnostic or laboratory reagents on a backing, prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006: Other".

The general, column one duty rate is free.  Duty rates are provided for your convenience and are subject to change.

**EFFECT ON OTHER RULINGS:**

NY 860953, dated March 28, 1991, is hereby MODIFIED in accordance with the above analysis.

In accordance with 19 U.S.C. §1625(c), this ruling will become effective 60 days after publication in the Customs Bulletin.

Sincerely,

Myles B. Harmon, Director
Commercial and Trade Facilitation Division

# Exhibit H

HQ H259355

December 19, 2017

**OT:RR:CTF:CPMM** H259355 APP

**CATEGORY:** Classification

**TARIFF NO.:** 3002.12.00; 3822.00.50

Andrea Abraham, Esq.
Meeks, Sheppard, Leo & Pillsbury
1735 Post Road, Suite 4
Fairfield, CT 06824

**RE:** Request for a ruling; Classification of reference materials used in VITROS systems

Dear Ms. Abraham:

This is in response to your request for a binding ruling[1] dated June 30, 2014, which was filed on behalf of Ortho Clinical Diagnostics, Inc. ("requestor" or "OCD").[2] You request a ruling concerning the classification of eight reference materials used to calibrate, verify the calibration range, and monitor the performance of OCD's VITROS Immunodiagnostic Systems under the Harmonized Tariff Schedule of the United States ("HTSUS").

**FACTS:**

OCD requests a classification ruling on the following eight items: Intact PTH Control #6802895, Folate Range Verifiers #6800873, Troponin I ES Range Verifiers #6802303, Ferritin Calibrators #6800378 or #1158864, Anti-HIV 1+2 Calibrators #6801862, VITROS Immunodiagnostic Products Testosterone Calibrators #1306026, VITROS Immunodiagnostic Products Testosterone Verifiers #6800661, and VITROS Immunodiagnostic Products Testosterone Controls #6800660. These calibrators, controls,

---

[1] The requestor originally submitted the request for a binding ruling on May 19, 2014, but it was incomplete and was returned. The requestor resubmitted its request for a binding ruling on five items on June 30, 2014, and provided additional information in subsequent submissions on July 27, 2015 and March 31, 2016, which also added three more items to its original ruling request. The requestor attached the instructions for use and the bill of materials with Chemical Abstract Service ("CAS") numbers.
[2] *See* Ortho Clinical Diagnostics, Solutions & Products, https://orthoclinical.com/en-us/solutions-products (last visited June 28, 2017).

and verifiers represent materials of known analyte concentration that can be run in OCD's VITROS systems to ensure they meet the quality and performance requirements prior to and/or after the testing of a patient sample. The products contain specific analyte levels and matrix composition.

Calibration is "the process of testing and adjusting the instrument or test system readout to establish a correlation between the instrument's measurement of the substance being tested and the actual concentration of the substance."[3] A calibrator is the "material that has been manufactured or assayed to have known, *measured* values of one or more characteristics. The assayed values are provided with the material."[4] A control sample is defined as a "sample prepared in the same or nearly same way as a test or unknown sample and which should give an expected, predetermined result."[5] Calibration verification means "testing materials of known concentration in the same manner as patient specimens to assure the test system is accurately measuring samples throughout the reportable range."[6]

U.S. Customs and Border Protection's ("CBP") Laboratories and Scientific Services, New York Laboratory reviewed the information submitted by requestor for the various products and issued two laboratory reports (CBP Laboratory Report No. NY20141081, dated October 10, 2014, and CBP Laboratory Report No. NY20170004, dated April 5, 2017). These two CBP laboratory reports determined the following:

> The product, **Intact PTH Control**, consists [of] a set of three calibrators containing different concentrations of a mixture consisting of a hormone and bovine serum albumin prepared for diagnostic use only. The product is not accompanied by a certificate which indicates the values of the certified properties, the methods used to determine the values and the degree of certainty associated with each value, and the certifying authority.

> The product, **Troponin I ES range verifier**, consists of a set of two calibrators containing different concentrations of a mixture consisting of a protein in human serum prepared for diagnostic use only. The product is not accompanied by a certificate which indicates the values of the certified properties, the methods used to determine the values and the degree of certainty associated with each value, and the certifying authority.

> The product, **Folate range verifier**, consists of a set of two calibrators containing different concentrations of a mixture consisting of folic acid in

---

[3] Centers for Disease Control and Prevention, Centers for Medicare and Medicaid Services, and Department of Health and Human Services, *Calibration and Calibration Verification*, https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/Downloads/6065bk.pdf (last visited Sept. 6, 2017).
[4] *See* Lili Wang & Robert A. Hoffman, *Standardization, Calibration, and Control in Flow Cytometry*, http://ws680 nist.gov/publication/get_pdf.cfm?pub_id=921423 (last visited Sept. 5, 2017).
[5] *See id.*
[6] *See supra* note 3.

a buffer solution containing human serum albumin prepared for diagnostic use only.  The product is not accompanied by a certificate which indicates the values of the certified properties, the methods used to determine the values and the degree of certainty associated with each value, and the certifying authority.

The product, *Ferritin calibrators*, consists [of] a set of three calibrators containing different concentrations of a mixture consisting of a protein in human plasma prepared for diagnostic use only.  The product is not accompanied by a certificate which indicates the values of the certified properties, the methods used to determine the values and the degree of certainty associated with each value, and the certifying authority.

The product, *Anti-HIV 1+2 calibrators*, consists of a calibrant containing antisera derived from human blood and prepared for diagnostic use only.  The product is not accompanied by a certificate which indicates the values of the certified properties, the methods used to determine the values and the degree of certainty associated with each value, and the certifying authority.

Product: *VITROS Immunodiagnostic Products Testosterone Calibrators*, **Catalogue Code: 130 6026** [**Ingredients:** Testosterone in human serum with antimicrobial agent.  **Use:** For the quantitative measurement of testosterone in human serum and plasma (EDTA or heparin)].  The documents provided by the importer that will accompany the product at importation do not describe the method used to determine the product values and the degree of certainty associated with each value.  As per Note 2(a) to Chapter 38, the product does not meet the definition for certified reference material.

Product: *VITROS Immunodiagnostic Products Testosterone Controls*, **Catalogue Code: 680 0660** [**Ingredients:** Freeze-dried, human serum with antimicrobial agent.  **Use:** For the measurement of testosterone in human serum and plasma (EDTA or heparin)].  The documents provided by the importer that will accompany the product at importation do not describe the method used to determine the product values and the degree of certainty associated with each value.  As per Note 2(a) to Chapter 38 the product does not meet the definition for certified reference material.

Product: *VITROS Immunodiagnostic Products Testosterone Range Verifiers*, **Catalogue Code: 680 0661** [**Ingredients:** Freeze-dried, testosterone in human serum with antimicrobial agent.  **Use:** For the measurement of testosterone].  The documents provided by the importer that will accompany the product at importation do not describe the method used to determine the product values and the degree of certainty associated

with each value. As per Note 2(a) to Chapter 38 the product does not meet the definition for certified reference material.

(emphasis added).

Additionally, the importer notes that OCD sells the VITROS immunodiagnostic systems and that the calibrators, range verifiers, and controls are used to calibrate these systems and to certify their performance. The values are assigned by running the controls, calibrators, and range verifiers on the corresponding VITROS system numerous times. The calibration range is traceable to in-house reference calibrators.

**ISSUES:**

1. Whether the instant merchandise is classifiable as antisera and other blood fractions of heading 3002, HTSUS, or as diagnostic or laboratory reagents, or certified reference materials of heading 3822, HTSUS.

2. If the instant merchandise is classifiable in heading 3822, HTSUS, whether it is classifiable as "diagnostic or laboratory reagents … other than those of heading 3002" under subheading 3822.00.50, HTSUS or as certified reference materials under subheading 3822.00.60, HTSUS.

**LAW AND ANALYSIS:**

Classification of goods under the HTSUS is governed by the General Rules of Interpretation ("GRIs"). GRI 1 provides that classification shall be determined according to the terms of the headings of the tariff schedule and any relative section or chapter notes. In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRIs may then be applied. Pursuant to GRI 6, classification at the subheading level uses the same rules, *mutatis mutandis*, as classification at the heading level.

The HTSUS provisions at issue are as follows:

3002        Human blood; animal blood prepared for therapeutic, prophylactic or diagnostic uses; antisera and other blood fractions and modified immunological products, whether or not modified or obtained by means of biotechnological processes; vaccines, toxins, cultures of micro-organisms (excluding yeasts) and similar products:

      Antisera, other blood fractions and immunological products, whether or not obtained by means of biotechnological processes:

3002.12.00            Antisera and other blood fractions

3822                Diagnostic or laboratory reagents on a backing and prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006; certified reference materials:

                                Diagnostic or laboratory reagents on a backing, prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006:

3822.00.50                Other

3822.00.60                Certified reference materials

Note 1(h) to Chapter 30 (Pharmaceutical Products), HTSUS, states that this chapter does not cover "[b]lood albumin not prepared for therapeutic or prophylactic uses (heading 3502)."

Note 2 to Chapter 38 (Miscellaneous Chemical Products), HTSUS states:

2. (a) For the purposes of heading 3822, the expression "certified reference materials" means reference materials which are accompanied by a certificate which indicates the values of the certified properties, the methods used to determine these values and the degree of certainty associated with each value and which are suitable for analytical, calibrating or referencing purposes.

(b) With the exception of the products of chapter 28 or 29, for the classification of certified reference materials, heading 3822 shall take precedence over any other heading in the tariff schedule.

The Harmonized Commodity Description and Coding System Explanatory Notes ("ENs") constitute the official interpretation of the Harmonized System at the international level. While neither legally binding nor dispositive, the ENs provide a commentary on the scope of each heading of the HTSUS and are generally indicative of the proper interpretation of the headings. It is CBP's practice to consult, whenever possible, the terms of the ENs when interpreting the HTSUS. *See* T.D. 89–80, 54 Fed. Reg. 35127, 35128 (August 23, 1989).

EN 30.02 states, in relevant part, that this heading covers:

**… (C) Antisera, other blood fractions and immunological products, whether or not modified or obtained by means of biotechnological processes.**

These products include:

(1) **Antisera and other blood fractions, whether or not modified or obtained by means of biotechnological processes.**

Sera are the fluid fractions separated from blood after clotting.

The heading covers, *inter alia*, the following products derived from blood (including vascular endothelial cells): "normal" sera, human normal immunoglobulin, blood fractions and truncated variants (parts) thereof with enzymatic properties/activity, plasma, thrombin, fibrinogen, fibrin and other blood coagulation factors, thrombomodulin, blood globulins, serum globulins, and haemoglobin.  This group also includes modified thrombomodulins and modified haemoglobins obtained by means of biotechnological processes, e.g., sothrombomodulin alfa (INN) and thrombomodulin alfa (INN), as well as cross-linked haemoglobins such as hemoglobin crosfumaril (INN), hemoglobin glutamer (INN) and hemoglobin raffimer (INN).

The heading further includes blood albumin (e.g., human albumin obtained by fractionating the plasma of whole human blood), prepared for therapeutic or prophylactic uses.

Antisera are obtained from the blood of humans or of animals which are immune or have been immunised against diseases or ailments, whether these are caused by pathogenic bacteria and viruses, toxins or allergic phenomena, etc.   Antisera are used against diphtheria, dysentery, gangrene, meningitis, pneumonia, tetanus, staphylococcal or streptococcal infections, snake bite, vegetable poisoning, allergic diseases, etc.  Antisera are also used for diagnostic purposes, including in vitro tests.  Specific immunoglobulins are purified preparations of antisera.

The heading **does not cover** blood albumin not prepared for therapeutic or prophylactic uses (**heading 35.02**) or globulins (other than blood globulins and serum globulins) (**heading 35.04**).   The heading also **excludes** medicaments which are not separated from the blood but which in some countries are described as "sera" or "artificial sera"; they include isotonic solutions based on sodium chloride or other chemicals and suspensions of pollen which are used against allergic diseases ….

EN 38.22 states, in relevant part, that:

This heading covers **diagnostic or laboratory reagents on a backing, prepared diagnostic** or **laboratory reagents, other than** diagnostic reagents of **heading 30.02** or diagnostic reagents designed to be administered to the patient and blood grouping reagents of **heading 30.06**. It also covers **certified reference materials**. Diagnostic reagents are used in the evaluation of physical, biophysical or biochemical processes and states in animals and humans; their function is based upon a measurable or observable change in the biological or chemical substances constituting the reagent. Prepared diagnostic reagents of this heading may be similar in function to those designed to be administered to patients (subheading 3006.30), with the exception that they are used for *in vitro*, rather than for *in vivo*, applications. Prepared laboratory reagents include not only diagnostic reagents, but also other analytical reagents used for purposes other than detection or diagnosis. Prepared diagnostic and laboratory reagents may be used in medical, veterinary, scientific or industrial laboratories, in hospitals, in industry, in the field or, in some cases, in the home.

Reagents of this heading are either on a backing or in the form of preparations and thus comprise more than a single constituent. For example, they may consist of admixtures of two or more reagents or of single reagents dissolved in solvents other than water. They may also be in the form of paper, plastics or other materials (used as backings or support), impregnated or coated with one or more diagnostic or laboratory reagents, such as litmus, pH or pole-finding papers or pre-coated immuno-assay plates. Reagents of this heading may also be put up in the form of kits, consisting of several components, even if one or more components are separate chemically defined compounds of Chapter 28 or Chapter 29, synthetic colouring matter of heading 32.04 or any other substance which, when presented separately, would be classifiable under another heading. Examples of such kits are those for testing glucose in blood, ketones in urine, etc., and those based on enzymes. However, diagnostic kits having the essential character of products of **heading 30.02** or **30.06** (e.g., those based on monoclonal or polyclonal antibodies) are **excluded**.

The reagents of this heading should be clearly identifiable as being for use only as diagnostic or laboratory reagents. This must be clear from their composition, labelling, instructions for *in vitro* or laboratory use, indication of the specific diagnostic test to be performed or physical form (e.g., presented on a backing or support).

With the **exception** of the products of **Chapter 28** or **29**, for the classification of certified reference materials, heading 38.22 shall take precedence over any other heading in the Nomenclature.

The certified reference materials of this heading are reference materials prepared for the calibration of an apparatus, the assessment of a measurement method or the assignment of values to a material.  These reference materials may consist of the following:

(a)  Substrate materials containing added analytes, the concentration of which has been accurately determined;

(b)  Unmixed materials, the concentration of certain components of which has been accurately determined (e.g., the protein and fat content of milk powder);

(c)  Materials, whether natural or synthetic, certain properties of which have been accurately determined (e.g., tensile strength, specific gravity).

***These reference materials must be accompanied by a certificate which indicates the values of the certified properties, the methods used to determine the values and the degree of certainty associated with each value, and the certifying authority.***

(emphasis added).

If the instant merchandise is a certified reference material, it is classified in heading 3822, HTSUS, specifically in subheading 3822.00.60, HTSUS, as such.  If it is not a certified reference material, but is instead a product of heading 3002, HTSUS, such as antisera and other blood fractions and modified immunological products, then by the exclusionary terms of heading 3822, HTSUS, it is classified in heading 3002, HTSUS.  If it does not qualify as a certified reference material of subheading 3822.00.60, HTSUS or as a reagent of heading 3002 HTSUS, it is classifiable in heading 3822, HTSUS, specifically in subheading 3822.00.50, HTSUS.

Pursuant to Note 2(a) to Chapter 38, HTSUS, certified reference materials must be accompanied by a certificate, which indicates the values of the certified properties, the methods used to determine these values, and the degree of certainty associated with each value.  CBP has previously classified certified reference materials under heading 3822, HTSUS, specifically under subheading 3822.00.60, HTSUS, provided they complied with the requirements in Note 2(a) to Chapter 38, HTSUS.  *See* New York Ruling Letter ("NY") N232989, dated October 4, 2012 (the company was a known producer of certified reference materials and had provided a certificate for the certified reference standard used in laboratory analysis in compliance with the requirements in Note 2(a) to Chapter 38, HTSUS); NY L88599, dated January 20, 2006 (the calibration mixtures were accompanied by a certificate of analysis indicating the values of the certified properties, the methods used to determine these values, the degree of certainty associated with each value, and the certifying authority); NY N152405, dated March 18, 2011 (various ISO 17025 liquid density certified reference materials, which were the standard for the calibration of density measuring equipment in compliance with the requirements in Note

2(a) to Chapter 38, HTSUS); NY N109995, dated June 25, 2010 (various ISO 17025 liquid density certified reference materials, which were the standard for the calibration of density measuring equipment in compliance with the requirements in Note 2(a) to Chapter 38, HTSUS); NY N052415, dated March 13, 2009 (calibration and cleaning kit in compliance with the requirements in Note 2(a) to Chapter 38, HTSUS).

However, from an examination of the documents submitted and confirmation in the two CBP laboratory reports, *see supra*, we conclude that unlike the products in the above-cited CBP rulings, the subject reference materials are not certified reference materials pursuant to Note 2(a) to Chapter 38, HTSUS, because they do not indicate the values of the certified properties, the methods used to determine these values, and the degree of certainty associated with each value. We will next determine the proper classification of the instant reference materials.

Hawley's Condensed Chemical Dictionary defines a reagent, in part, as "Any substance used in a reaction for the purpose of detecting, measuring, examining, or analyzing other substances".[7] The instant products are prepared diagnostic reagents because they are used for the purpose of the *in vitro* evaluation (detecting, measuring, examining, or analyzing) a specific substance or substances which serve as an indicator of physical, biophysical or biochemical processes and states in humans, they consist of more than a single constituent, and they are dissolved in a solvent matrix other than water (in the cases at hand, serum, serum albumin, or plasma). They are classifiable in heading 3822, HTSUS, as such, provided they are not described by heading 3002, HTSUS (or heading 3006, HTSUS, which is not implicated here). Products of heading 3002, HTSUS, include human blood; animal blood prepared for therapeutic, prophylactic or diagnostic uses; antisera, other blood fractions and immunological products ...; vaccines, toxins, cultures of micro-organisms … and similar products.

Of the eight products at issue, only the product Anti-HIV 1+2 Calibrators is wholly comprised of products of heading 3002, HTSUS (anti-virus calibrators and antisera) and is thus a product of heading 3002, HTSUS. It is therefore excluded from classification in heading 3822, HTSUS.

The Intact PTH Control and the Folate Range Verifiers do not contain any product of heading 3002, HTSUS. Human and animal albumin prepared for diagnostic use is not listed in the heading text and is specifically excluded by EN 30.02 and Note 1(h) to Chapter 30, HTSUS.

Although, the rest of the calibrators, verifiers and controls include human plasma and human serum, which are products of heading 3002, HTSUS, those products merely serve as the reagents' solvent matrix. Therefore, the subject Troponin, Ferritin and Testosterone products are not excluded from classification in heading 3822, HTSUS, and are classified there.

---

[7] The Hawley's Condensed Chemical Dictionary 953 (14th ed. 2001).

**HOLDING:**

By application of GRIs 1 and 6, the Intact PTH Control, Folate Range Verifiers, Troponin I ES Range Verifiers, Ferritin Calibrators, VITROS Immunodiagnostic Products Testosterone Calibrators, VITROS Immunodiagnostic Products Testosterone Controls, and VITROS Immunodiagnostic Products Testosterone Range Verifiers are properly classified under heading 3822, specifically under subheading 3822.00.50, HTSUS, which provides for "Diagnostic or laboratory reagents on a backing and prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006; certified reference materials: Diagnostic or laboratory reagents on a backing, prepared diagnostic or laboratory reagents, whether or not on a backing, other than those of heading 3002 or 3006: Other."  The 2017 column one, general rate of duty is *Free*.

By application of GRIs 1 and 6, the product Anti-HIV 1+2 Calibrators is properly classified under heading 3002, HTSUS, specifically under subheading 3002.12.00, HTSUS, which provides for "Human blood; animal blood prepared for therapeutic, prophylactic or diagnostic uses; antisera and other blood fractions and modified immunological products, whether or not modified or obtained by means of biotechnological processes; vaccines, toxins, cultures of micro-organisms (excluding yeasts) and similar products: Antisera, other blood fractions and immunological products, whether or not obtained by means of biotechnological processes: Antisera and other blood fractions."  The 2017 column one, general rate of duty is *Free*.

Duty rates are provided for your convenience and are subject to change.  The text of the most recent HTSUS and the accompanying duty rates are provided at https://hts.usitc.gov/current.

A copy of this ruling letter should be attached to the entry documents filed at the time the goods are entered.

Sincerely,

Myles B. Harmon, Director
Commercial and Trade Facilitation Division